(Slip Opinion) OCTOBER TERM, 2010 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA ET AL. *v.* WHITING ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 09–115. Argued December 8, 2010—Decided May 26, 2011

The Immigration Reform and Control Act (IRCA) makes it "unlawful for a person or other entity . . . to hire, or to recruit or refer for a fee, for employment in the United States an alien knowing the alien is an unauthorized alien." 8 U. S. C. §1324a(a)(1)(A). Employers that violate that prohibition may be subjected to federal civil and criminal sanctions. IRCA also restricts the ability of States to combat employment of unauthorized workers; the Act expressly preempts "any State or local law imposing civil or criminal sanctions (other than through licensing and similar laws) upon those who employ, or recruit or refer for a fee for employment, unauthorized aliens." §1324a(h)(2).

IRCA also requires employers to take steps to verify an employee's eligibility for employment. In an attempt to improve that verification process in the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA), Congress created E-Verify—an internet-based system employers can use to check the work authorization status of employees.

Against this statutory background, several States have recently enacted laws attempting to impose sanctions for the employment of unauthorized aliens through, among other things, "licensing and similar laws." Arizona is one of them. The Legal Arizona Workers Act provides that the licenses of state employers that knowingly or intentionally employ unauthorized aliens may be, and in certain circumstances must be, suspended or revoked. That law also requires that all Arizona employers use E-Verify.

The Chamber of Commerce of the United States and various business and civil rights organizations (collectively Chamber) filed this

federal preenforcement suit against those charged with administering the Arizona law, arguing that the state law's license suspension and revocation provisions were both expressly and impliedly preempted by federal immigration law, and that the mandatory use of E-Verify was impliedly preempted. The District Court found that the plain language of IRCA's preemption clause did not invalidate the Arizona law because the law did no more than impose licensing conditions on businesses operating within the State. Nor was the state law preempted with respect to E-Verify, the court concluded, because although Congress had made the program voluntary at the national level, it had expressed no intent to prevent States from mandating participation. The Ninth Circuit affirmed.

*Held:* The judgment is affirmed.

558 F. 3d 856, affirmed.

THE CHIEF JUSTICE delivered the opinion of the Court with respect to Parts I and II–A, concluding that Arizona's licensing law is not expressly preempted.

Arizona's licensing law falls well within the confines of the authority Congress chose to leave to the States and therefore is not expressly preempted. While IRCA prohibits States from imposing "civil or criminal sanctions" on those who employ unauthorized aliens, it preserves state authority to impose sanctions "through licensing and similar laws." §1324a(h)(2). That is what the Arizona law does—it instructs courts to suspend or revoke the business licenses of in-state employers that employ unauthorized aliens. The definition of "license" contained in the Arizona statute largely parrots the definition of "license" that Congress codified in the Administrative Procedure Act (APA).

The state statute also includes within its definition of "license" documents such as articles of incorporation, certificates of partnership, and grants of authority to foreign companies to transact business in the State, Ariz. Rev. Stat. Ann. §23–211(9), each of which has clear counterparts in APA and dictionary definitions of the word "license." And even if a law regulating articles of incorporation and the like is not itself a "licensing law," it is at the very least "similar" to one, and therefore comfortably within the savings clause. The Chamber's argument that the Arizona law is not a "licensing" law because it operates only to suspend and revoke licenses rather than to grant them is without basis in law, fact, or logic.

The Chamber contends that the savings clause should apply only to certain types of licenses or only to license revocation following an IRCA adjudication because Congress, when enacting IRCA, eliminated unauthorized worker prohibitions and associated adjudication procedures in another federal statute. But no such limits are even

remotely discernible in the statutory text.

The Chamber's reliance on IRCA's legislative history to bolster its textual and structural arguments is unavailing given the Court's conclusion that Arizona's law falls within the plain text of the savings clause. Pp. 9–15.

THE CHIEF JUSTICE, joined by JUSTICE SCALIA, JUSTICE KENNEDY, and JUSTICE ALITO, concluded in Part II–B:

The Arizona licensing law is not impliedly preempted by federal law. At its broadest, the Chamber's argument is that Congress intended the federal system to be exclusive. But Arizona's procedures simply implement the sanctions that Congress expressly allowed the States to pursue through licensing laws. Given that Congress specifically preserved such authority for the States, it stands to reason that Congress did not intend to prevent the States from using appropriate tools to exercise that authority.

And here Arizona's law closely tracks IRCA's provisions in all material respects. For example, it adopts the federal definition of who qualifies as an "unauthorized alien," compare 8 U. S. C. §1324a(h)(3) with Ariz. Rev. Stat. Ann. §23–211(11); provides that state investigators must verify the work authorization of an allegedly unauthorized alien with the Federal Government, making no independent determination of the matter, §23–212(B); and requires a state court to "consider only the federal government's determination," §23–212(H).

The Chamber's more general contention that the Arizona law is preempted because it upsets the balance that Congress sought to strike in IRCA also fails. The cases on which the Chamber relies in making this argument all involve uniquely federal areas of interest, see, *e.g., Buckman Co.* v. *Plaintiffs' Legal Comm.*, 531 U. S. 341. Regulating in-state businesses through licensing laws is not such an area. And those cases all concern state actions that directly interfered with the operation of a federal program, see, *e.g., id.,* at 351. There is no similar interference here.

The Chamber asserts that employers will err on the side of discrimination rather than risk the " 'business death penalty' " by "hiring unauthorized workers." That is not the choice. License termination is not an available sanction for merely hiring unauthorized workers, but is triggered only by far more egregious violations. And because the Arizona law covers only knowing or intentional violations, an employer acting in good faith need not fear the law's sanctions. Moreover, federal and state antidiscrimination laws protect against employment discrimination and provide employers with a strong incentive not to discriminate. Employers also enjoy safe harbors from liability when using E-Verify as required by the Arizona law. The most rational path for employers is to obey both the law

barring the employment of unauthorized aliens and the law prohibit-
ing discrimination.  There is no reason to suppose that Arizona em-
ployers will choose not to do so.  Pp. 15–22.

THE CHIEF JUSTICE delivered the opinion of the Court with respect
to Part III–A, concluding that Arizona's E-Verify mandate is not im-
pliedly preempted.

Arizona's requirement that employers use E-Verify is not impliedly
preempted.  The IIRIRA provision setting up E-Verify contains no
language circumscribing state action.  It does, however, constrain
federal action: absent a prior violation of federal law, "the Secretary
of Homeland Security may not require any person or . . . entity" out-
side the Federal Government "to participate in" E-Verify.  IIRIRA,
§402(a), (e).  The fact that the Federal Government may require the
use of E-Verify in only limited circumstances says nothing about
what the States may do.  The Government recently argued just that
in another case and approvingly referenced Arizona's law as an ex-
ample of a permissible use of E-Verify when doing so.

Moreover, Arizona's use of E-Verify does not conflict with the fed-
eral scheme.  The state law requires no more than that an employer,
after hiring an employee, "verify the employment eligibility of the
employee" through E-Verify.  Ariz. Rev. Stat. Ann. §23–214(A).  And
the consequences of not using E-Verify are the same under the state
and federal law—an employer forfeits an otherwise available rebut-
table presumption of compliance with the law.  Pp. 23–24.

THE CHIEF JUSTICE, joined by JUSTICE SCALIA, JUSTICE KENNEDY,
and JUSTICE ALITO, concluded in Part III–B:

Arizona's requirement that employers use E-Verify in no way ob-
structs achieving the aims of the federal program.  In fact, the Gov-
ernment has consistently expanded and encouraged the use of E-
Verify, and Congress has directed that E-Verify be made available in
all 50 States.  And the Government has expressly rejected the Cham-
ber's claim that the Arizona law, and those like it, will overload the
federal system.  Pp. 24–25.

ROBERTS, C. J., delivered the opinion of the Court, except as to Parts
II–B and III–B.  SCALIA, KENNEDY, and ALITO, JJ., joined that opinion
in full, and THOMAS, J., joined as to Parts I, II–A, and III–A and con-
curred in the judgment.  BREYER, J., filed a dissenting opinion, in which
GINSBURG, J., joined.  SOTOMAYOR, J., filed a dissenting opinion.  KAGAN,
J., took no part in the consideration or decision of the case.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 09–115

CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, ET AL., PETITIONERS *v.* MICHAEL B. WHITING ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[May 26, 2011]

CHIEF JUSTICE ROBERTS delivered the opinion of the Court, except as to Parts II–B and III–B.*

Federal immigration law expressly preempts "any State or local law imposing civil or criminal sanctions (other than through licensing and similar laws) upon those who employ . . . unauthorized aliens." 8 U. S. C. §1324a(h)(2). A recently enacted Arizona statute—the Legal Arizona Workers Act—provides that the licenses of state employers that knowingly or intentionally employ unauthorized aliens may be, and in certain circumstances must be, suspended or revoked. The law also requires that all Arizona employers use a federal electronic verification system to confirm that the workers they employ are legally authorized workers. The question presented is whether federal immigration law preempts those provisions of Arizona law. Because we conclude that the State's licensing provisions fall squarely within the federal statute's savings clause and that the Arizona regulation does

————————

*JUSTICE THOMAS joins Parts I, II–A, and III–A of this opinion and concurs in the judgment.

not otherwise conflict with federal law, we hold that the Arizona law is not preempted.

## I
## A

In 1952, Congress enacted the Immigration and Nationality Act (INA), 66 Stat. 163, as amended, 8 U. S. C. §1101 *et seq*. That statute established a "comprehensive federal statutory scheme for regulation of immigration and naturalization" and set "the terms and conditions of admission to the country and the subsequent treatment of aliens lawfully in the country." *De Canas* v. *Bica*, 424 U. S. 351, 353, 359 (1976).

In the years following the enactment of the INA, several States took action to prohibit the employment of individuals living within state borders who were not lawful residents of the United States. For example, in 1971 California passed a law providing that "[n]o employer shall knowingly employ an alien who is not entitled to lawful residence in the United States if such employment would have an adverse effect on lawful resident workers." 1971 Cal. Stats. ch. 1442, §1(a). The California law imposed fines ranging from $200 to $500 for each violation of this prohibition. §1(b). At least 11 other States enacted provisions during that same time period proscribing the employment of unauthorized aliens.[1]

We first addressed the interaction of federal immigration law and state laws dealing with the employment of unauthorized aliens in *De Canas*, 424 U. S. 351. In that

---

[1] See Conn. Gen. Stat. §31–51k (1973) (enacted 1972); Del. Code Ann., Tit. 19, §705 (Cum. Supp. 1978) (enacted 1976); Fla. Stat. §448.09 (1981) (enacted 1977); Kan. Stat. Ann. §21–4409 (1981) (enacted 1973); 1985 La. Acts p. 1894; 1977 Me. Acts p. 171; 1976 Mass. Acts p. 641; Mont. Code Ann. §41–121 (1977 Cum. Supp.); N. H. Rev. Stat. Ann. §275–A:4–a (1986 Cum. Supp.) (enacted 1976); 1977 Vt. Laws p. 320; 1977 Va. Acts ch. 438.

case, we recognized that the "[p]ower to regulate immigration is unquestionably . . . a federal power." *Id.,* at 354. At the same time, however, we noted that the "States possess broad authority under their police powers to regulate the employment relationship to protect workers within the State," *id.,* at 356, that "prohibit[ing] the knowing employment . . . of persons not entitled to lawful residence in the United States, let alone to work here, is certainly within the mainstream of [the State's] police power," *ibid.*, and that the Federal Government had "at best" expressed "a peripheral concern with [the] employment of illegal entrants" at that point in time, *id.,* at 360. As a result, we declined to hold that a state law assessing civil fines for the employment of unauthorized aliens was preempted by federal immigration law.

Ten years after *De Canas*, Congress enacted the Immigration Reform and Control Act (IRCA), 100 Stat. 3359. IRCA makes it "unlawful for a person or other entity . . . to hire, or to recruit or refer for a fee, for employment in the United States an alien knowing the alien is an unauthorized alien." 8 U. S. C. §1324a(a)(1)(A). IRCA defines an "unauthorized alien" as an alien who is not "lawfully admitted for permanent residence" or not otherwise authorized by the Attorney General to be employed in the United States. §1324a(h)(3).

To facilitate compliance with this prohibition, IRCA requires that employers review documents establishing an employee's eligibility for employment. §1324a(b). An employer can confirm an employee's authorization to work by reviewing the employee's United States passport, resident alien card, alien registration card, or other document approved by the Attorney General; or by reviewing a combination of other documents such as a driver's license and social security card. §1324a(b)(1)(B)–(D). The employer must attest under penalty of perjury on Department of Homeland Security Form I–9 that he "has verified

that the individual is not an unauthorized alien" by re-
viewing these documents. §1324a(b)(1)(A). The form I–9
itself "and any information contained in or appended to [it]
. . . may not be used for purposes other than for enforce-
ment of" IRCA and other specified provisions of federal
law. §1324a(b)(5).

Employers that violate IRCA's strictures may be sub-
jected to both civil and criminal sanctions. Immigration
and Customs Enforcement, an entity within the Depart-
ment of Homeland Security, is authorized to bring charges
against a noncompliant employer under §1324a(e). De-
pending on the circumstances of the violation, a civil fine
ranging from $250 to $16,000 per unauthorized worker
may be imposed. See §1324a(e)(4)(A); 73 Fed. Reg. 10136
(2008). Employers that engage in a pattern or practice
of violating IRCA's requirements can be criminally prose-
cuted, fined, and imprisoned for up to six months.
§1324a(f)(1). The Act also imposes fines for engaging in
"unfair immigration-related employment practice[s]" such
as discriminating on the basis of citizenship or national
origin. §1324b(a)(1); see §1324b(g)(2)(B). Good-faith com-
pliance with IRCA's I–9 document review requirements
provides an employer with an affirmative defense if
charged with a §1324a violation. §1324a(a)(3).

IRCA also restricts the ability of States to combat em-
ployment of unauthorized workers. The Act expressly
preempts "any State or local law imposing civil or criminal
sanctions (other than through licensing and similar laws)
upon those who employ, or recruit or refer for a fee for
employment, unauthorized aliens." §1324a(h)(2). Under
that provision, state laws imposing civil fines for the
employment of unauthorized workers like the one we
upheld in *De Canas* are now expressly preempted.

In 1996, in an attempt to improve IRCA's employment
verification system, Congress created three experimental
complements to the I–9 process as part of the Illegal Im-

migration Reform and Immigrant Responsibility Act (IIRIRA), 110 Stat. 3009–655, note following 8 U. S. C. §1324a. *Arizona Contractors Assn., Inc.* v. *Candelaria*, 534 F. Supp. 2d 1036, 1042 (Ariz. 2008); see 8 U. S. C. §1324a(d). Only one of those programs—E-Verify— remains in operation today. Originally known as the "Basic Pilot Program," E-Verify "is an internet-based system that allows an employer to verify an employee's work-authorization status." *Chicanos Por La Causa, Inc.* v. *Napolitano*, 558 F. 3d 856, 862 (CA9 2009). An employer submits a request to the E-Verify system based on information that the employee provides similar to that used in the I–9 process. In response to that request, the employer receives either a confirmation or a tentative nonconfirmation of the employee's authorization to work. An employee may challenge a nonconfirmation report. If the employee does not do so, or if his challenge is unsuccessful, his employment must be terminated or the Federal Government must be informed. See *ibid.*

In the absence of a prior violation of certain federal laws, IIRIRA prohibits the Secretary of Homeland Security from "requir[ing] any person or . . . entity" outside the Federal Government "to participate in" the E-Verify program, §402(a), (e), 110 Stat. 3009–656 to 3009–658. To promote use of the program, however, the statute provides that any employer that utilizes E-Verify "and obtains confirmation of identity and employment eligibility in compliance with the terms and conditions of the program . . . has established a rebuttable presumption" that it has not violated IRCA's unauthorized alien employment prohibition, §402(b)(1), *id.*, at 3009–656 to 3009–657.

## B

Acting against this statutory and historical background, several States have recently enacted laws attempting to impose sanctions for the employment of unauthorized

aliens through, among other things, "licensing and similar laws," 8 U. S. C. §1324a(h)(2).[2]  Arizona is one of them. The Legal Arizona Workers Act of 2007 allows Arizona courts to suspend or revoke the licenses necessary to do business in the State if an employer knowingly or intentionally employs an unauthorized alien.  Ariz. Rev. Stat. Ann. §§23–211, 212, 212.01 (West Supp. 2010) (citing 8 U. S. C. §1324a).

Under the Arizona law, if an individual files a complaint alleging that an employer has hired an unauthorized alien, the attorney general or the county attorney first verifies the employee's work authorization with the Federal Government pursuant to 8 U. S. C. §1373(c).  Ariz. Rev. Stat. Ann. §23–212(B).  Section 1373(c) provides that the Federal Government "shall respond to an inquiry by a" State "seeking to verify or ascertain the citizenship or immigration status of any individual . . . by providing the requested verification or status information."  The Arizona law expressly prohibits state, county, or local officials from attempting "to independently make a final determination on whether an alien is authorized to work in the United States."  Ariz. Rev. Stat. Ann. §23–212(B).  If the §1373(c) inquiry reveals that a worker is an unauthorized alien, the attorney general or the county attorney must notify United States Immigration and Customs Enforcement officials, notify local law enforcement, and bring an action against the employer.  §23–212(C)(1)–(3), (D).

When a complaint is brought against an employer under Arizona law, "the court shall consider only the federal government's determination pursuant to" 8 U. S. C.

_____

[2]See, *e.g.,* Colo. Rev. Stat. Ann. §8–17.5–102 (2008); Miss. Code Ann. §71–11–3(7)(e) (Supp. 2010); Mo. Rev. Stat. §§285–525, 285–535 (2009 Cum. Supp.); Pa. Stat. Ann., Tit. 73, §820.311 (Purdon Supp. 2010); S. C. Code Ann. §41–8–50(D)(2) (Supp. 2010); Tenn. Code Ann. §50–1–103(d) (2008); Va. Code Ann. §2.2–4311.1 (Lexis 2008); W. Va. Code Ann. §21–1B–7 (Lexis Supp. 2010).

§1373(c) in "determining whether an employee is an unau-
thorized alien." §23–212(H). Good-faith compliance with
the federal I–9 process provides employers prosecuted by
the State with an affirmative defense. §23–212(J).

A first instance of "knowingly employ[ing] an unauthor-
ized alien" requires that the court order the employer to
terminate the employment of all unauthorized aliens and
file quarterly reports on all new hires for a probationary
period of three years. §23–212(A), (F)(1)(a)–(b). The court
may also "order the appropriate agencies to suspend all
licenses . . . that are held by the employer for [a period]
not to exceed ten business days." §23–212(F)(1)(d). A
second knowing violation requires that the adjudicating
court "permanently revoke all licenses that are held by the
employer specific to the business location where the unau-
thorized alien performed work." §23–212(F)(2).

For a first intentional violation, the court must order
the employer to terminate the employment of all unau-
thorized aliens and file quarterly reports on all new hires
for a probationary period of five years. §23–212.01(A),
(F)(1)(a)–(b). The court must also suspend all the
employer's licenses for a minimum of 10 days. §23–
212.01(F)(1)(c). A second intentional violation requires
the permanent revocation of all business licenses. §23–
212.01(F)(2).

With respect to both knowing and intentional violations,
a violation qualifies as a "second violation" only if it oc-
curs at the same business location as the first violation,
during the time that the employer is already on probation
for a violation at that location. §23–212(F)(3)(a)–(b); §23–
212.01(F)(3)(a)–(b).

The Arizona law also requires that "every employer,
after hiring an employee, shall verify the employment
eligibility of the employee" by using E-Verify. §23–

214(A).[3]   "[P]roof of verifying the employment authoriza-
tion of an employee through the e-verify program creates a
rebuttable presumption that an employer did not know-
ingly employ an unauthorized alien."  §23–212(I).

C

The Chamber of Commerce of the United States and
various business and civil rights organizations (collec-
tively Chamber of Commerce or Chamber) filed a pre-
enforcement suit in federal court against those charged
with administering the Arizona law: more than a dozen
Arizona county attorneys, the Governor of Arizona, the
Arizona attorney general, the Arizona registrar of contrac-
tors, and the director of the Arizona Department of Reve-
nue (collectively Arizona).[4]   The Chamber argued that the
Arizona law's provisions allowing the suspension and
revocation of business licenses for employing unauthorized
aliens were both expressly and impliedly preempted by
federal immigration law, and that the mandatory use of
E-Verify was impliedly preempted.

The District Court held that Arizona's law was not pre-
empted.  534 F. Supp. 2d 1036.  It found that the plain
language of IRCA's preemption clause did not preempt the

_____

[3] Several States have passed statutes mandating the use of E-Verify.
See, *e.g.,* Miss. Code Ann. §71–11–3(3)(d), (4)(b)(i) (Supp. 2010); S. C.
Code Ann. §41–8–20(B)–(C) (Supp. 2010); Utah Code Ann. §13–47–
201(1) (Lexis Supp. 2010); Va. Code Ann. §40.1–11.2 (Lexis Supp.
2010).

[4] No suits had been brought under the Arizona law when the com-
plaint in this case was filed.  As of the date that Arizona submitted its
merits brief to this Court only three enforcement actions had been
pursued against Arizona employers.  See *Arizona* v. *Waterworld Ltd.
Partnership*, No. CV2009–038848 (Maricopa Cty. Super. Ct., filed Dec.
21, 2009) (resolved by consent judgment); *Arizona* v. *Danny's Subway
Inc.*, No. CV2010–005886 (Maricopa Cty. Super. Ct., filed Mar. 9, 2010)
(resolved by consent decree); *Arizona* v. *Scottsdale Art Factory, LLC*,
No. CV2009–036359 (Maricopa Cty. Super. Ct., filed Nov. 18, 2009)
(pending).

Arizona law because the state law does no more than impose licensing conditions on businesses operating within the State. *Id.,* at 1045–1046. With respect to E-Verify, the court concluded that although Congress had made the program voluntary at the national level, it had expressed no intent to prevent States from mandating participation. *Id.,* at 1055–1057. The Court of Appeals affirmed the District Court in all respects, holding that Arizona's law was a "'licensing and similar law[]'" falling within IRCA's savings clause and that none of the state law's challenged provisions was "expressly or impliedly preempted by federal policy." 558 F. 3d, at 860, 861, 866.

We granted certiorari. 561 U. S. \_\_\_ (2010).

## II

The Chamber of Commerce argues that Arizona's law is expressly preempted by IRCA's text and impliedly preempted because it conflicts with federal law. We address each of the Chamber's arguments in turn.

## A

When a federal law contains an express preemption clause, we "focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' preemptive intent." *CSX Transp., Inc.* v. *Easterwood,* 507 U. S. 658, 664 (1993).

IRCA expressly preempts States from imposing "civil or criminal sanctions" on those who employ unauthorized aliens, "other than through licensing and similar laws." 8 U. S. C. §1324a(h)(2). The Arizona law, on its face, purports to impose sanctions through licensing laws. The state law authorizes state courts to suspend or revoke an employer's business licenses if that employer knowingly or intentionally employs an unauthorized alien. Ariz. Rev. Stat. Ann. §23–212(A) and (F); §23–212.01(A) and (F). The Arizona law defines "license" as "any agency permit,

certificate, approval, registration, charter or similar form
of authorization that is required by law and that is issued
by any agency for the purposes of operating a business in"
the State. §23–211(9)(a). That definition largely parrots
the definition of "license" that Congress codified in the
Administrative Procedure Act. See 5 U. S. C. §551(8)
("'license' includes the whole or a part of an agency per-
mit, certificate, approval, registration, charter, member-
ship, statutory exemption or other form of permission").

Apart from that general definition, the Arizona law
specifically includes within its definition of "license" docu-
ments such as articles of incorporation, certificates of
partnership, and grants of authority to foreign companies
to transact business in the State. Ariz. Rev. Stat. Ann.
§23–211(9). These examples have clear counterparts in
the APA definition just quoted. See 5 U. S. C. §551(8)
(defining "license" as including a "registration" or "charter").

A license is "a right or permission granted in accordance
with law . . . to engage in some business or occupation, to
do some act, or to engage in some transaction which but
for such license would be unlawful." Webster's Third New
International Dictionary 1304 (2002). Articles of incorpo-
ration and certificates of partnership allow the formation
of legal entities and permit them as such to engage in
business and transactions "which but for such" authoriza-
tion "would be unlawful." *Ibid.*; see Ariz. Rev. Stat. Ann.
§§10–302, 302(11) (West 2004) (articles of incorporation
allow a corporation "to carry out its business and affairs"
and to "[c]onduct its business"); see also §10–202(A)(3)
(West Supp. 2010). As for state-issued authorizations for
foreign businesses to operate within a State, we have re-
peatedly referred to those as "licenses." See, *e.g., Heli-
copteros Nacionales de Colombia, S. A.* v. *Hall*, 466 U. S.
408, 417 (1984); *G. D. Searle & Co.* v. *Cohn*, 455 U. S. 404,
413, n. 8 (1982); *Rosenberg Bros. & Co.* v. *Curtis Brown
Co.*, 260 U. S. 516, 518 (1923). Moreover, even if a law

regulating articles of incorporation, partnership certificates, and the like is not itself a "licensing law," it is at the very least "similar" to a licensing law, and therefore comfortably within the savings clause.    8 U. S. C. §1324a(h)(2).[5]

The Chamber and the United States as *amicus* argue that the Arizona law is not a "licensing" law because it operates only to suspend and revoke licenses rather than to grant them. Again, this construction of the term runs contrary to the definition that Congress itself has codified. See 5 U. S. C. §551(9) ("'licensing' includes agency process respecting the grant, renewal, denial, *revocation, suspension, annulment, withdrawal,* limitation, amendment, modification, or conditioning of a license" (emphasis added)). It is also contrary to common sense. There is no basis in law, fact, or logic for deeming a law that grants licenses a licensing law, but a law that suspends or revokes those very licenses something else altogether.

————————

[5] JUSTICE BREYER recognizes that Arizona's definition of the word "license" comports with dictionaries' treatment of the term, but argues that "license" must be read in a more restricted way so as not to include things such as "marriage licenses" and "dog licens[es]." *Post*, at 2, 12 (dissenting opinion). Luckily, we need not address such fanciful hypotheticals; Arizona limits its definition of "license" to those state permissions issued "for the purposes of operating a business" in the State. Ariz. Rev. Stat. Ann. §23–211(9)(a) (West Supp. 2010).

JUSTICE BREYER's primary concern appears to be that state permissions such as articles of incorporation and partnership certificates are treated as "licensing and similar laws." Because myriad other licenses are required to operate a business, that concern is largely academic. See §42–5005(A) (West 2006) (Corporations that receive "gross proceeds of sales or gross income upon which a privilege tax is imposed . . . shall make application to the department for a privilege license." Such a corporation "shall not engage or continue in business until the [corporation] has obtained a privilege license."). Suspending or revoking an employer's articles of incorporation will often be entirely redundant. See §§42–5010, 5061–5076 (West 2006 and West Supp. 2010) (describing when transaction privilege tax licenses are required).

The Chamber also submits that the manner in which Congress amended a related statute when enacting IRCA supports a narrow interpretation of the savings clause. The Migrant and Seasonal Agricultural Worker Protection Act (AWPA), 29 U. S. C. §1801 *et seq.*, requires employers to secure a registration certificate from the Department of Labor before engaging in any "farm labor contracting activity." §1811(a). Prior to IRCA, AWPA had contained its own prohibition on hiring unauthorized workers, with accompanying adjudication procedures. See §1813(a); §1816(a) (1982 ed.) (repealed by IRCA, 100 Stat. 3372); §1851(a)–(b) (1982 ed.) (amended by IRCA, 100 Stat. 3372). When Congress enacted IRCA, it repealed AWPA's separate unauthorized worker prohibition and eliminated the associated adjudication process. Under the current state of the law, an AWPA certification may be denied based on a prior IRCA violation. §1813(a)(6) (2006 ed.). And once obtained, that certification can be revoked because of the employment of an unauthorized alien only following a finding of an IRCA violation. *Ibid.*

The Chamber asserts that IRCA's amendment of AWPA shows that Congress meant to allow state licensing sanctions only after a federal IRCA adjudication, just as adverse action under AWPA can now be taken only through IRCA's procedures. But the text of IRCA's savings clause says nothing about state licensing sanctions being contingent on prior federal adjudication, or indeed about state licensing processes at all. The simple fact that federal law creates procedures for federal investigations and adjudications culminating in federal civil or criminal sanctions does not indicate that Congress intended to prevent States from establishing their own procedures for imposing their own sanctions through licensing. Were AWPA not amended to conform with IRCA, two different federal agencies would be responsible for administering two different unauthorized alien employment laws. The conform-

ing amendments eliminated that potential redundancy and centralized federal adjudicatory authority. That hardly supports a conclusion that any state licensing programs must also be contingent on the central federal system.

In much the same vein, the Chamber argues that Congress's repeal of "AWPA's separate prohibition concerning unauthorized workers belies any suggestion that IRCA meant to authorize each of the 50 States . . . to impose its own separate prohibition," and that Congress instead wanted uniformity in immigration law enforcement. Brief for Petitioners 36. JUSTICE BREYER also objects to the departure from "one centralized enforcement scheme" under federal law. *Post*, at 7 (dissenting opinion). But Congress expressly preserved the ability of the States to impose their own sanctions through licensing; that—like our federal system in general—necessarily entails the prospect of some departure from homogeneity. And as for "separate prohibition[s]," it is worth recalling that the Arizona licensing law is based exclusively on the federal prohibition—a court reviewing a complaint under the Arizona law may "consider only the federal government's determination" with respect to "whether an employee is an unauthorized alien." §23–212(H).

Even more boldly, the Chamber contends that IRCA's savings clause was intended to allow States to impose licensing sanctions solely on AWPA-related farm contracting licensees. AWPA specifically recognized that federal regulation of farm contracting licensing was only "intended to supplement State law," 29 U. S. C. §1871, and the Chamber argues that the purpose of IRCA's savings clause was limited to preserving existing state farm contractor licensing programs. But here again no such limit is remotely discernible in the statutory text. Absent any textual basis, we are not inclined to limit so markedly the otherwise broad phrasing of the savings clause. See

*United States* v. *Shreveport Grain & Elevator Co.*, 287
U. S. 77, 83 (1932) ("extrinsic aids to construction" may be
used "to solve, but not to create, an ambiguity" (emphasis
and internal quotation marks omitted)).

The Chamber argues that its textual and structural
arguments are bolstered by IRCA's legislative history. We
have already concluded that Arizona's law falls within the
plain text of IRCA's savings clause. And, as we have said
before, Congress's "authoritative statement is the statu-
tory text, not the legislative history." *Exxon Mobil Corp.*
v. *Allapattah Services, Inc.*, 545 U. S. 546, 568 (2005); see
also *Hoffman Plastic Compounds, Inc.* v. *NLRB*, 535 U. S.
137, 149–150, n. 4 (2002). Whatever the usefulness of
relying on legislative history materials in general, the
arguments against doing so are particularly compelling
here. Beyond verbatim recitation of the statutory text, all
of the legislative history documents related to IRCA save
one fail to discuss the savings clause at all. The Senate
Judiciary Committee Report on the Senate version of
the law does not comment on it. See S. Rep. No. 99–132
(1985). Only one of the four House Reports on the law
touches on the licensing exception, see H. R. Rep. No. 99–
682, pt. 1, p. 58 (1986), and we have previously dismissed
that very report as "a rather slender reed" from "one
House of a politically divided Congress." *Hoffman*, *supra,*
at 149–150, n. 4. And the Conference Committee Report
does not discuss the scope of IRCA's preemption provision
in any way. See H. Conf. Rep. No. 99–1000 (1986).[6]

_____

[6] JUSTICE BREYER poses several rhetorical questions challenging our
reading of IRCA and then goes on to propose two seemingly alternative
views of the phrase "licensing and similar laws"—that it was meant to
refer to "employment-related licensing systems," *post*, at 11 (dissenting
opinion) (emphasis deleted), or, even more narrowly, to "the licensing of
firms in the business of recruiting or referring workers for employment,
such as . . . state agricultural labor contractor licensing schemes," *post*,
at 13. If we are asking questions, a more telling one may be why, if

IRCA expressly preempts some state powers dealing with the employment of unauthorized aliens and it expressly preserves others. We hold that Arizona's licensing law falls well within the confines of the authority Congress chose to leave to the States and therefore is not expressly preempted.

B

As an alternative to its express preemption argument, the Chamber contends that Arizona's law is impliedly preempted because it conflicts with federal law. At its broadest level, the Chamber's argument is that Congress "intended the federal system to be exclusive," and that any state system therefore necessarily conflicts with federal law. Brief for Petitioners 39. But Arizona's procedures simply implement the sanctions that Congress expressly allowed Arizona to pursue through licensing laws. Given that Congress specifically preserved such authority for the States, it stands to reason that Congress did not intend to prevent the States from using appropriate tools to exercise

_____

Congress had intended such limited exceptions to its prohibition on state sanctions, it did not simply say so, instead of excepting "licensing and similar laws" generally?

JUSTICE SOTOMAYOR takes a different tack. Invoking arguments that resemble those found in our implied preemption cases, she concludes that the Arizona law "falls outside" the savings clause and is expressly preempted because it allows "state courts to determine whether a person has employed an unauthorized alien." *Post*, at 2 (dissenting opinion). While JUSTICE BREYER would add language to the statute narrowly limiting the phrase "licensing and similar laws" to specific types of licenses, JUSTICE SOTOMAYOR creates an entirely new statutory requirement: She would allow States to impose sanctions through "licensing and similar laws" only after a federal adjudication. Such a requirement is found nowhere in the text, and JUSTICE SOTOMAYOR does not even attempt to link it to a specific textual provision.

It should not be surprising that the two dissents have sharply different views on how to read the statute. That is the sort of thing that can happen when statutory analysis is so untethered from the text.

that authority.

And here Arizona went the extra mile in ensuring that its law closely tracks IRCA's provisions in all material respects. The Arizona law begins by adopting the federal definition of who qualifies as an "unauthorized alien." Compare 8 U. S. C. §1324a(h)(3) (an "unauthorized alien" is an alien not "lawfully admitted for permanent residence" or not otherwise authorized by federal law to be employed) with Ariz. Rev. Stat. Ann. §23–211(11) (adopting the federal definition of "unauthorized alien"); see *De Canas*, 424 U. S., at 363 (finding no preemption of state law that operates "only with respect to individuals whom the Federal Government has already declared cannot work in this country").

Not only that, the Arizona law expressly provides that state investigators must verify the work authorization of an allegedly unauthorized alien with the Federal Government, and "shall not attempt to independently make a final determination on whether an alien is authorized to work in the United States." §23–212(B). What is more, a state court "shall consider *only* the federal government's determination" when deciding "whether an employee is an unauthorized alien." §23–212(H) (emphasis added). As a result, there can by definition be no conflict between state and federal law as to worker authorization, either at the investigatory or adjudicatory stage.[7]

───────────

[7] After specifying that a state court may consider "only" the federal determination, the Arizona law goes on to provide that the federal determination is "a rebuttable presumption of the employee's lawful status," Ariz. Rev. Stat. Ann. §23–212(H) (West Supp. 2010). Arizona explains that this provision does not permit the State to establish unlawful status apart from the federal determination—the provision could hardly do that, given the foregoing. It instead operates to "ensur[e] that the *employer* has an opportunity to rebut the evidence presented to establish a worker's unlawful status." Brief for Respondents 49 (emphasis added). Only in that sense is the federal determination a "rebuttable presumption." See Tr. of Oral Arg. 46–47. Giving

The federal determination on which the State must rely is provided under 8 U. S. C. §1373(c). See *supra*, at 6–7. That provision requires the Federal Government to "verify or ascertain" an individual's "citizenship or immigration status" in response to a state request. JUSTICE BREYER is concerned that this information "says nothing about work authorization." *Post*, at 9 (dissenting opinion). JUSTICE SOTOMAYOR shares that concern. *Post*, at 10 (dissenting opinion). But if a §1373(c) inquiry reveals that someone is a United States citizen, that certainly answers the question whether that individual is authorized to work. The same would be true if the response to a §1373(c) query disclosed that the individual was a lawful permanent resident alien or, on the other hand, had been ordered removed. In any event, if the information provided under §1373(c) does not confirm that an employee is an unauthorized alien, then the State cannot prove its case. See Brief for Respondents 50, n. 10 ("if the information from the federal authorities does not establish that a person is an unauthorized alien, it means that the county attorney cannot satisfy his burden of proof in an enforcement action"); Tr. of Oral Arg. 47.

From this basic starting point, the Arizona law continues to trace the federal law. Both the state and federal law prohibit "knowingly" employing an unauthorized alien. Compare 8 U. S. C. §1324a(a)(1)(A) with Ariz. Rev. Stat. Ann. §23–212(A).[8] But the state law does not stop there in guarding against any conflict with the federal law. The Arizona law provides that "'[k]nowingly employ an unauthorized alien' means the actions described in 8

_____

an employer a chance to show that it did not break the state law certainly does not place the Arizona regime in conflict with federal law.

[8] State law also prohibits "intentionally" employing an unauthorized alien, §23–212.01(A), a more severe violation of the law. The Chamber does not suggest that this prohibition is any more problematic than the prohibition on "knowingly" employing an unauthorized alien.

United States Code §1324a," and that the "term shall be interpreted consistently with 8 United States Code §1324a and any applicable federal rules and regulations." §23–211(8).

The Arizona law provides employers with the same affirmative defense for good-faith compliance with the I–9 process as does the federal law.  Compare 8 U. S. C. §1324a(a)(3) ("A person or entity that establishes that it has complied in good faith with the [employment verification] requirements of [§1324a(b)] with respect to hiring . . . an alien . . . has established an affirmative defense that the person or entity has not violated" the law) with Ariz. Rev. Stat. Ann. §23–212(J) ("an employer that establishes that it has complied in good faith with the requirements of 8 United States Code section 1324a(b) establishes an affirmative defense that the employer did not knowingly employ an unauthorized alien").[9]  And both the federal and Arizona law accord employers a rebuttable presumption of compliance with the law when they use E-Verify to validate a finding of employment eligibility.  Compare IIRIRA §402(b), 110 Stat. 3009–656 to 3009–657 with Ariz. Rev. Stat. Ann. §23–212(I).

Apart from the mechanics of the Arizona law, the Chamber argues more generally that the law is preempted because it upsets the balance that Congress sought to strike when enacting IRCA.  In the Chamber's view, IRCA

--------

[9] The Chamber contends that the Arizona law conflicts with federal law because IRCA prohibits the use of the I–9 form and "any information contained in or appended to [it]" from being "used for purposes other than for enforcement of" IRCA and other specified federal laws.  8 U. S. C. §1324a(b)(5).  That argument mistakenly assumes that an employer would need to use the I–9 form or its supporting documents themselves to receive the benefit of the affirmative defense in Arizona court.  In fact, "[a]n employer [could] establish good faith compliance with [the] I–9 process[] . . . through testimony of employees and descriptions of office policy."  Brief for Respondents 52; see Tr. of Oral Arg. 33.

reflects Congress's careful balancing of several policy considerations—deterring unauthorized alien employment, avoiding burdens on employers, protecting employee privacy, and guarding against employment discrimination. According to the Chamber, the harshness of Arizona's law "'exert[s] an extraneous pull on the scheme established by Congress'" that impermissibly upsets that balance. Brief for Petitioners 45 (quoting *Buckman Co.* v. *Plaintiffs' Legal Comm.*, 531 U. S. 341, 353 (2001)); see Brief for Petitioners 42–45; Reply Brief for Petitioners 20.

As an initial matter, the cases on which the Chamber relies in advancing this argument all involve uniquely federal areas of regulation. See *American Ins. Assn.* v. *Garamendi*, 539 U. S. 396, 401, 405–406 (2003) (presidential conduct of foreign policy); *Crosby* v. *National Foreign Trade Council*, 530 U. S. 363, 373–374 (2000) (foreign affairs power); *Buckman Co.* v. *Plaintiffs' Legal Comm.*, 531 U. S. 341, 352 (2001) (fraud on a federal agency); *United States* v. *Locke*, 529 U. S. 89, 97, 99 (2000) (regulation of maritime vessels); *Bonito Boats, Inc.* v. *Thunder Craft Boats, Inc.*, 489 U. S. 141, 143–144 (1989) (patent law). Regulating in-state businesses through licensing laws has never been considered such an area of dominant federal concern.

Furthermore, those cases all concern state actions that directly interfered with the operation of the federal program. In *Buckman*, for example, the Court determined that allowing a state tort action would cause applicants before a federal agency "to submit a deluge of information that the [agency] neither wants nor needs, resulting in additional burdens on the [agency's] evaluation of an application," and harmful delays in the agency process. 531 U. S., at 351. In *Garamendi*, a state law imposing sanctions on insurance companies directly "thwart[ed] the [Federal] Government's policy of repose" for insurance companies that participated in an international program

negotiated by the President. 539 U. S., at 425. *Crosby*
involved a state law imposing sanctions on any entity do-
ing business with Burma, a law that left the President
with "less to offer and less economic and diplomatic lever-
age" in exercising his foreign affairs powers. 530 U. S., at
377. The state law in *Bonito Boats* extended patent-like
protection "for subject matter for which patent protection
has been denied or has expired," "thus eroding the general
rule of free competition upon which the attractiveness of
the federal patent bargain depends." 489 U. S., at 159,
161. And the portions of *Locke* on which the Chamber
relies involved state efforts "to impose additional unique
substantive regulation on the at-sea conduct of vessels"—
"an area where the federal interest has been manifest
since the beginning of our Republic." 529 U. S., at 106, 99.
There is no similar interference with the federal program
in this case; that program operates unimpeded by the
state law.

License suspension and revocation are significant sanc-
tions. But they are typical attributes of a licensing re-
gime. Numerous Arizona laws provide for the suspension
or revocation of licenses for failing to comply with specified
state laws. See, *e.g.,* Ariz. Rev. Stat. Ann. §§5–108.05(D),
32–852.01(L), 32–1154(B), 32–1451(M), 41–2186 (West
2002). Federal law recognizes that the authority to license
includes the authority to suspend, revoke, annul, or with-
draw a license. See 5 U. S. C. §551(9). Indeed, AWPA
itself—on which the Chamber so heavily relies—provides
that AWPA "certificates of registration" can be suspended
or revoked for employing an unauthorized alien. 29
U. S. C. §1813(a)(6). It makes little sense to preserve state
authority to impose sanctions through licensing, but not
allow States to revoke licenses when appropriate as one of
those sanctions.

The Chamber and JUSTICE BREYER assert that employ-
ers will err on the side of discrimination rather than risk

the "'business death penalty'" by "hiring unauthorized
workers." *Post*, at 6–7 (dissenting opinion); see Brief for
Petitioners 3, 35. That is not the choice. License termina-
tion is not an available sanction simply for "hiring unau-
thorized workers." Only far more egregious violations of
the law trigger that consequence. The Arizona law covers
only knowing or intentional violations. The law's perma-
nent licensing sanctions do not come into play until a
second knowing or intentional violation at the same busi-
ness location, and only if the second violation occurs while
the employer is still on probation for the first. These
limits ensure that licensing sanctions are imposed only
when an employer's conduct fully justifies them. An
employer acting in good faith need have no fear of the
sanctions.

As the Chamber points out, IRCA has its own anti-
discrimination provisions, see 8 U. S. C. §1324b(a)(1),
(g)(1)(B) (imposing sanctions for discrimination "against
any individual . . . with respect to the hiring . . . or the
discharging of the individual from employment"); Arizona
law certainly does nothing to displace those. Other federal
laws, and Arizona anti-discrimination laws, provide fur-
ther protection against employment discrimination—and
strong incentive for employers not to discriminate. See,
*e.g.,* 42 U. S. C. §2000e–2(a) (prohibiting discrimination
based on "race, color, religion, sex, or national origin");
Ariz. Rev. Stat. Ann. §41–1463(B)(1) (West Supp. 2010)
(prohibiting employment discrimination based on "race,
color, religion, sex, age, or national origin").

All that is required to avoid sanctions under the Legal
Arizona Workers Act is to refrain from knowingly or inten-
tionally violating the employment law. Employers enjoy
safe harbors from liability when they use the I–9 system
and E-Verify—as Arizona law requires them to do. The
most rational path for employers is to obey the law—both
the law barring the employment of unauthorized aliens

and the law prohibiting discrimination—and there is no reason to suppose that Arizona employers will choose not to do so.

As with any piece of legislation, Congress did indeed seek to strike a balance among a variety of interests when it enacted IRCA. Part of that balance, however, involved allocating authority between the Federal Government and the States. The principle that Congress adopted in doing so was not that the Federal Government can impose large sanctions, and the States only small ones. IRCA instead preserved state authority over a particular category of sanctions—those imposed "through licensing and similar laws."

Of course Arizona hopes that its law will result in more effective enforcement of the prohibition on employing unauthorized aliens. But in preserving to the States the authority to impose sanctions through licensing laws, Congress did not intend to preserve only those state laws that would have no effect. The balancing process that culminated in IRCA resulted in a ban on hiring unauthorized aliens, and the state law here simply seeks to enforce that ban.

Implied preemption analysis does not justify a "freewheeling judicial inquiry into whether a state statute is in tension with federal objectives"; such an endeavor "would undercut the principle that it is Congress rather than the courts that preempts state law." *Gade* v. *National Solid Wastes Management Assn.*, 505 U. S. 88, 111 (1992) (KENNEDY, J., concurring in part and concurring in judgment); see *Silkwood* v. *Kerr-McGee Corp.*, 464 U. S. 238, 256 (1984). Our precedents "establish that a high threshold must be met if a state law is to be pre-empted for conflicting with the purposes of a federal Act." *Gade*, *supra*, at 110. That threshold is not met here.

### III

The Chamber also argues that Arizona's requirement that employers use the federal E-Verify system to determine whether an employee is authorized to work is impliedly preempted. In the Chamber's view, "Congress wanted to develop a reliable and non-burdensome system of work-authorization verification" that could serve as an alternative to the I–9 procedures, and the "mandatory use of E-Verify impedes that purpose." 558 F. 3d, at 866.

### A

We begin again with the relevant text. The provision of IIRIRA setting up the program that includes E-Verify contains no language circumscribing state action. It does, however, constrain federal action: absent a prior violation of federal law, "the Secretary of Homeland Security may not require any person or other entity [outside of the Federal Government] to participate in a pilot program" such as E-Verify. IIRIRA §402(a), 110 Stat. 3009–656. That provision limits what the Secretary of Homeland Security may do—nothing more.

The Federal Government recently argued just that, and approvingly referenced Arizona's E-Verify law when doing so. In 2008, an Executive Order mandated that executive agencies require federal contractors to use E-Verify as a condition of receiving a federal contract. See Exec. Order No. 13465, 73 Fed. Reg. 33286 (2008). When that Order and its implementing regulation were challenged, the Government pointed to Arizona's E-Verify mandate as an example of a permissible use of that system: "[T]he State of Arizona has required all public and private employers in that State to use E-Verify . . . . *This is permissible* because the State of Arizona is not the Secretary of Homeland Security." Defendants' Reply Memorandum in Support of Their Motion for Summary Judgment in No. 8:08–cv–03444 (D Md.), p. 7 (emphasis added), appeal dism'd,

No. 09–2006 (CA4, Dec. 14, 2009).

Arizona's use of E-Verify does not conflict with the federal scheme. The Arizona law requires that "every employer, after hiring an employee, shall verify the employment eligibility of the employee" through E-Verify. Ariz. Rev. Stat. Ann. §23–214(A) (West Supp. 2010). That requirement is entirely consistent with the federal law. And the consequences of not using E-Verify under the Arizona law are the same as the consequences of not using the system under federal law. In both instances, the only result is that the employer forfeits the otherwise available rebuttable presumption that it complied with the law. Compare IIRIRA §402(b)(1) with Ariz. Rev. Stat. Ann. §23–212(I).[10]

### B

Congress's objective in authorizing the development of E-Verify was to ensure reliability in employment authorization verification, combat counterfeiting of identity documents, and protect employee privacy. 8 U. S. C. §1324a(d)(2). Arizona's requirement that employers operating within its borders use E-Verify in no way obstructs achieving those aims.

In fact, the Federal Government has consistently expanded and encouraged the use of E-Verify. When E-Verify was created in 1996, it was meant to last just four years and it was made available in only six States. IIRIRA §401(b) and (c)(1), 110 Stat. 3009–655 to 3009–656. Congress since has acted to extend the E-Verify program's existence on four separate occasions, the most recent of which ensures the program's vitality through

---

[10] Arizona has since amended its statute to include other consequences, such as the loss of state-allocated economic development incentives. See 2008 Ariz. Sess. Laws ch. 152. Because those provisions were not part of the statute when this suit was brought, they are not before us and we do not address their interaction with federal law.

2012.[11]   And in 2003 Congress directed the Secretary of Homeland Security to make E-Verify available in all 50 States.   117 Stat. 1944; IIRIRA §401(c)(1), 110 Stat. 3009–656.   The Department of Homeland Security has even used "billboard and radio advertisements . . . to encourage greater participation" in the E-Verify program.   534 F. Supp. 2d, at 1056.

The Chamber contends that "if the 49 other States followed Arizona's lead, the state-mandated drain on federal resources would overwhelm the federal system and render it completely ineffective, thereby defeating Congress's primary objective in establishing E-Verify."   Brief for Petitioners 50–51.   Whatever the legal significance of that argument, the United States does not agree with the factual premise.   According to the Department of Homeland Security, "the E-Verify system can accommodate the increased use that the Arizona statute and existing similar laws would create."   Brief for United States as *Amicus Curiae* 34.   And the United States notes that "[t]he government continues to encourage more employers to participate" in E-Verify.   *Id.,* at 31.

The Chamber has reservations about E-Verify's reliability, see Brief for Petitioners 49, n. 27, but again the United States disagrees.   The Federal Government reports that "E-Verify's successful track record . . . is borne out by findings documenting the system's accuracy and participants' satisfaction."   Brief for United States as *Amicus Curiae* 31.   Indeed, according to the Government, the program is "the best means available to determine the employment eligibility of new hires."   U. S. Dept. of Homeland Security, U. S. Citizenship and Immigration Services,

——————

[11] See Basic Pilot Extension Act of 2001, §2, 115 Stat. 2407; Basic Pilot Program Extension and Expansion Act of 2003, §2, 117 Stat. 1944; Consolidated Security, Disaster Assistance, and Continuing Appropriations Act, 2009, Div. A, §143, 122 Stat. 3580; Department of Homeland Security Appropriations Act of 2010, §547, 123 Stat. 2177.

E-Verify User Manual for Employers 4 (Sept. 2010).[12]

\*     \*     \*

IRCA expressly reserves to the States the authority to impose sanctions on employers hiring unauthorized workers, through licensing and similar laws. In exercising that authority, Arizona has taken the route least likely to cause tension with federal law. It uses the Federal Government's own definition of "unauthorized alien," it relies solely on the Federal Government's own determination of who is an unauthorized alien, and it requires Arizona employers to use the Federal Government's own system for checking employee status. If even this gives rise to impermissible conflicts with federal law, then there really is no way for the State to implement licensing sanctions, contrary to the express terms of the savings clause.

Because Arizona's unauthorized alien employment law fits within the confines of IRCA's savings clause and does not conflict with federal immigration law, the judgment of

_____

[12] JUSTICE BREYER shares the Chamber's concern about E-Verify's accuracy. See *post*, at 8, 19. Statistics from Fiscal Year 2010, however, indicate that of the 15,640,167 E-Verify cases submitted, 98.3% were automatically confirmed as work authorized, 0.3% were confirmed as work authorized after contesting and resolving an initial nonconfirmation—an avenue available to all workers—and 1.43% were not found work authorized. E-Verify Statistics and Reports, available at http://www.uscis.gov/portal/site/uscis/menuitem/statistics (as visited May 23, 2011, and available in the Clerk of Court's case file). As JUSTICE BREYER notes, the initial mismatches (the 0.3%) are frequently due to "'incorrectly spelled [names] in government databases or on identification documents.'" *Post*, at 19. Such a hazard is of course not unique to E-Verify. Moreover, JUSTICE BREYER's statistical analysis underlying his conclusion that E-Verify queries, at least initially, wrongly "suggest[] that an individual [i]s not lawfully employable" "*18% of the time*" needs to be understood for what it is. *Post*, at 8. If E-Verify initially indicated that two individuals were not found work authorized, and later revealed that one of those determinations was incorrect, JUSTICE BREYER would be able to exclaim that the error rate was *50%*.

Opinion of ROBERTS, C. J.

the United States Court of Appeals for the Ninth Circuit is affirmed.

*It is so ordered.*

JUSTICE KAGAN took no part in the consideration or decision of this case.

# SUPREME COURT OF THE UNITED STATES

No. 09–115

CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, ET AL., PETITIONERS *v.* MICHAEL B. WHITING ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[May 26, 2011]

JUSTICE BREYER, with whom JUSTICE GINSBURG joins, dissenting.

The federal Immigration Reform and Control Act of 1986 (Act or IRCA) pre-empts "any State or local law imposing civil or criminal sanctions (other than through licensing and similar laws) upon those who employ, or recruit, or refer for a fee for employment, unauthorized aliens." 8 U. S. C. §1324a(h)(2). The state law before us, the Legal Arizona Workers Act, imposes civil sanctions upon those who employ unauthorized aliens. See Ariz. Rev. Stat. Ann. §23–211 *et seq.* (West Supp. 2010). Thus the state law falls within the federal Act's general pre-emption rule and is pre-empted—unless it also falls within that rule's exception for "licensing and similar laws." Unlike the Court, I do not believe the state law falls within this exception, and I consequently would hold it pre-empted.

Arizona calls its state statute a "licensing law," and the statute uses the word "licensing." But the statute strays beyond the bounds of the federal licensing exception, for it defines "license" to include articles of incorporation and partnership certificates, indeed *virtually every* state-law authorization for *any* firm, corporation, or partnership to do business in the State. §23–211(9)(a); cf. §23–211(9)(c)

(excepting professional licenses, and water and environ-
mental permits).  Congress did not intend its "licensing"
language to create so broad an exemption, for doing so
would permit States to eviscerate the federal Act's pre-
emption provision, indeed to subvert the Act itself, by
undermining Congress' efforts (1) to protect lawful work-
ers from national-origin-based discrimination and (2) to
protect lawful employers against erroneous prosecution or
punishment.

Dictionary definitions of the word "licensing" are, as the
majority points out, broad enough to include virtually any
permission that the State chooses to call a "license."  See
*ante*, at 10 (relying on a dictionary and the federal Admin-
istrative Procedure Act).  But neither dictionary defini-
tions nor the use of the word "license" in an unrelated
statute can demonstrate what scope Congress intended
the word "licensing" to have *as it used that word in this
federal statute*.  Instead, statutory context must ultimately
determine the word's coverage.  Context tells a driver that
he cannot produce a partnership certificate when a po-
liceman stops the car and asks for a license.  Context tells
all of us that "licensing" as used in the Act does not in-
clude marriage licenses or the licensing of domestic ani-
mals.  And context, which includes statutory purposes,
language, and history, tells us that the federal statute's
"licensing" language does not embrace Arizona's overly
broad definition of that term.  That is to say, ordinary
corporate charters, certificates of partnership, and the like
do not fall within the scope of the word "licensing" as used
in this federal exception.  See *Dolan* v. *Postal Service*, 546
U. S. 481, 486 (2006) (statutory interpretation requires
courts to "rea[d] the whole statutory text, conside[r] the
purpose and context of the statute, and consul[t] any
precedents or authorities that inform the analysis");
*United States* v. *Heirs of Boisdoré*, 8 How. 113, 122 (1849)
(similar).

## I

To understand how the majority's interpretation of the word "licensing" subverts the Act, one must understand the basic purposes of the pre-emption provision and of the Act itself. Ordinarily, an express pre-emption provision in a federal statute indicates a particular congressional interest in *preventing* States from enacting laws that might interfere with Congress' statutory objectives. See *International Paper Co.* v. *Ouellette*, 479 U. S. 481, 494 (1987). The majority's reading of the provision's "licensing" exception, however, does the opposite. It *facilitates* the creation of "'obstacle[s] to the accomplishment and execution of the full purposes and objectives of Congress.'" *Crosby* v. *National Foreign Trade Council*, 530 U. S. 363, 373 (2000) (quoting *Hines* v. *Davidowitz*, 312 U. S. 52, 67 (1941)).

### A

Essentially, the federal Act requires employers to verify the work eligibility of their employees. And in doing so, the Act balances three competing goals. First, it seeks to discourage American employers from hiring aliens not authorized to work in the United States. H. R. Rep. No. 99–682, pt. 1, p. 56 (1986).

Second, Congress wished to avoid "placing an undue burden on employers," *id.*, at 90, and the Act seeks to prevent the "harassment" of "innocent employers," S. Rep. No. 99–132, p. 35 (1985).

Third, the Act seeks to prevent employers from disfavoring job applicants who appear foreign. Reiterating long-standing antidiscrimination concerns, the House Committee Report explained:

> "Numerous witnesses . . . have expressed their deep concern that the imposition of employer sanctions will cause extensive employment discrimination against Hispanic-Americans and other minority group mem-

bers.  These witnesses are genuinely concerned that
employers, faced with the possibility of civil and
criminal penalties, will be extremely reluctant to hire
persons because of their linguistic or physical charac-
teristics."  H. R. Rep. No. 99–682, at 68.

See also 42 U. S. C. §2000e–2(a)(1) (making it an "unlaw-
ful employment practice" for an employer to discriminate
against an individual "because of such individual's race,
color, religion, sex, or national origin"); U. S. Commission
on Civil Rights, The Tarnished Golden Door: Civil Rights
Issues in Immigration 74 (1980) (finding that "increased
employment discrimination against United States citizens
and legal residents who are racially and culturally iden-
tifiable with major immigrant groups could be the un-
intended result of an employer sanctions law").   The
Committee concluded that "every effort must be taken to
minimize the potentiality of discrimination."   H. R. Rep.
No. 99–682, at 68.

### B

The Act reconciles these competing objectives in several
ways:

First, the Act prohibits employers from hiring an alien
knowing that the alien is unauthorized to work in the
United States.  8 U. S. C. §1324a(a)(1)(A).

Second, the Act provides an easy-to-use mechanism that
will allow employers to determine legality: the I–9 form.
In completing an I–9 form, the employer certifies that he
or she has examined one or two documents (*e.g.,* a pass-
port, or a driver's license along with a Social Security
card) that tend to confirm the worker's identity and em-
ployability.  §1324a(b)(1).  Completion of the form in good
faith immunizes the employer from liability, even if the
worker turns out to be unauthorized.   §§1324a(a)(3),
1324a(b)(6).

A later amendment to the law also allows an employer

to verify an employee's work eligibility through an Internet-based federal system called E-Verify. If the employer does so, he or she will receive the benefit of a rebuttable presumption of compliance. Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), §402(b), 110 Stat. 3009–656 to 3009–657, note following 8 U. S. C. §1324a, p. 331 (Pilot Programs for Employment Eligibility Confirmation).

Third, the Act creates a central enforcement mechanism. The Act directs the Attorney General to establish a single set of procedures for receiving complaints, investigating those complaints that "have a substantial probability of validity," and prosecuting violations. 8 U. S. C. §1324a(e)(1). The relevant immigration officials and administrative law judges have the power to access necessary evidence and witnesses, §1324a(e)(2), and the employer has the right to seek discovery from the Federal Government, 28 CFR §68.18 (2010). The employer also has the right to administrative and judicial review of the administrative law judge's decision. §§68.54, 68.56.

Fourth, the Act makes it "an unfair immigration-related employment practice . . . to discriminate against any individual" in respect to employment "because of such individual's national origin." 8 U. S. C. §1324b(a).

Fifth, the Act sets forth a carefully calibrated sanction system. The penalties for hiring unauthorized aliens are graduated to prevent the Act from unduly burdening employers who are not serious offenders. As adjusted for inflation, civil penalties for a first violation of the employment restrictions range from $375–$3,200 per worker, and rise to $3,200–$16,000 per worker for repeat offenders. §1324a(e)(4)(A); 73 Fed. Reg. 10133 (2008); see also §1324a(f) (imposing criminal fines of not more than $3,000 per worker and imprisonment for up to six months for "pattern or practice" violators of employment restrictions).

As importantly, the Act limits or removes any incentive

to discriminate on the basis of national origin by setting antidiscrimination fines at equivalent levels: $375–$3,200 per worker for first-time offenders, and $3,200–$16,000 per worker for repeat offenders. §1324b(g)(2)(B)(iv); 73 Fed. Reg. 10134. The Act then ties its unlawful employment and antidiscrimination provisions together by providing that, should the antihiring provisions terminate, the antidiscrimination provisions will also terminate, §1324b(k), "the justification for them having been removed," H. R. Conf. Rep. No. 99–1000, p. 87 (1986).

C

Now, compare and contrast Arizona's statute. As I have said, that statute applies to virtually all business-related licenses, other than professional licenses. Ariz. Rev. Stat. Ann. §23–211(9). Like the federal Act, the state law forbids the employment of unauthorized aliens. §§23–212(A), 23–212.01(A). It also provides employers with somewhat similar defenses. §§23–212(I)–(J), 23–212.01(I)–(J). But thereafter the state and federal laws part company.

First, the state statute seriously threatens the federal Act's antidiscriminatory objectives by radically skewing the relevant penalties. For example, in the absence of the Arizona statute, an Arizona employer who intentionally hires an unauthorized alien for the second time would risk a maximum penalty of $6,500. 8 U. S. C. §1324a(e)(4)(A)(ii); 73 Fed. Reg. 10133. But the Arizona statute subjects that same employer (in respect to the same two incidents) to mandatory, permanent loss of the right to do business in Arizona–a penalty that Arizona's Governor has called the "business death penalty." Ariz. Rev. Stat. Ann. §23–212.01(F)(2); News Release, Governor Signs Employer Sanctions Bill (2007), App. 399. At the same time, the state law leaves the other side of the punishment balance—the antidiscrimination side—unchanged.

This is no idle concern. Despite the federal Act's efforts

to prevent discriminatory practices, there is evidence that four years after it had become law, discrimination was a serious problem. In 1990, the General Accounting Office identified "widespread discrimination . . . as a result of" the Act. Report to the Congress, Immigration Reform: Employer Sanctions and the Question of Discrimination 3, 37, 80. Sixteen percent of employers in Los Angeles admitted that they applied the I–9 requirement "only to foreign-looking or foreign-sounding persons," and 22 percent of Texas employers reported that they "began a practice to (1) hire only persons born in the United States or (2) not hire persons with temporary work eligibility documents" because of the Act. *Id.*, at 41–43. If even the federal Act (with its carefully balanced penalties) can result in some employers discriminating, how will employers behave when erring on the side of discrimination leads only to relatively small fines, while erring on the side of hiring unauthorized workers leads to the "business death penalty"?

Second, Arizona's law subjects lawful employers to increased burdens and risks of erroneous prosecution. In addition to the Arizona law's severely burdensome sanctions, the law's procedures create enforcement risks not present in the federal system. The federal Act creates one centralized enforcement scheme, run by officials versed in immigration law and with access to the relevant federal documents. The upshot is an increased likelihood that federal officials (or the employer) will discover whether adverse information flows from an error-prone source and that they will proceed accordingly, thereby diminishing the likelihood that burdensome proceedings and liability reflect documentary mistakes.

Contrast the enforcement system that Arizona's statute creates. Any citizen of the State can complain (anonymously or otherwise) to the state attorney general (or any county attorney), who then "*shall* investigate," Ariz. Rev.

Stat. Ann. §23–212(B) (emphasis added), and, upon a determination that that the "complaint is not false and frivolous . . . shall notify the appropriate county attorney to bring an action," §23–212(C)(3). This mandatory language, the lower standard ("not frivolous" instead of "substantial"), and the removal of immigration officials from the state screening process (substituting numerous, elected county attorneys) increase the likelihood that suspicious circumstances will lead to prosecutions and liability of employers—even where more careful investigation would have revealed that there was no violation.

Again, this matter is far from trivial. Studies of one important source of Government information—the E-Verify system—describe how the federal administrative process *corrected* that system's tentative "unemployable" indications *18% of the time*. This substantial error rate is not a function of a small sample size. See *ante*, at 26, n. 12. Rather, data from one fiscal year showed 46,921 workers initially rejected but later "confirmed as work authorized"—all while E-Verify was used by only a fraction of the Nation's employers. U. S. Citizenship and Immigration Services, Statistics and Reports, http://www.uscis.gov/portal/site/uscis/menuitem.eb1d4c2a3e5b9a c89243c6a7543f6d1a/?vgnextchannel=7c579589cdb76210V gnVCM100000b92ca60aRCRD (Feb. 4, 2011) (as visited May 18, 2011, and available in Clerk of Court's case file). That is to say nearly one-in-five times that the E-Verify system suggested that an individual was not lawfully employable (*i.e.*, returned a tentative nonconfirmation of work authorization), the system was wrong; and subsequent review in the federal administrative process determined as much. (And those wrongly identified were likely to be persons of foreign, rather than domestic, origin, by a ratio of approximately 20 to 1.) See Westat, Findings of the E-Verify Program Evaluation xxxi, 210, 246 (Dec. 2009) (assessing data from April to June 2008). E-Verify's

accuracy rate is even worse "in states that require the use of E-Verify for all or some of their employees." *Id.*, at 122.

A related provision of the state law aggravates the risk of erroneous prosecutions. The state statute says that in "determining whether an employee is an unauthorized alien, the court shall consider only the federal government's determination pursuant to 8 [U. S. C.] §1373(c)." Ariz. Rev. Stat. Ann. §23–212(H). But the federal provision to which the state law refers, 8 U. S. C. §1373(c), says only that the Federal Government, upon a State's request, shall verify a person's "citizenship or immigration status." It says nothing about work authorization. See *post*, at 7–10 (SOTOMAYOR, J., dissenting). It says nothing about the source of the Federal Government's information. It imposes no duty upon the Federal Government or anyone else to investigate the validity of that information, which may falsely implicate an employer 18% of the time.

So what is the employer to do? What statute gives an employer whom the State proceeds against in state court the right to conduct discovery against the Federal Government? The Arizona statute, like the federal statute, says that the employer's use of an I–9 form provides a defense. But there is a hitch. The federal Act says that neither the I–9 form, nor "any information contained in or appended to" the form, "may . . . be used for purposes other than for enforcement of this" federal Act. §1324a(b)(5). So how can the employer present a defense, say, that the Government's information base is flawed? The majority takes the view that the forms are not *necessary* to receive the benefit of the affirmative defense. *Ante*, at 18, n. 9. But the I–9 form would surely be the employer's most effective evidence. See also *post*, at 11 (SOTOMAYOR, J., dissenting) (suggesting that the unavailability of I–9 forms to defend against state-court charges means that Congress "intended no such" proceedings).

Nor does the Arizona statute facilitate the presentation

of a defense when it immediately follows (1) its statement
that "the court shall consider *only* the federal govern-
ment's determination" when it considers "whether an
employee is an *unauthorized alien"* with (2) its statement
that "[t]he federal government's determination creates a
rebuttable presumption of the employee's *lawful* status."
Ariz. Rev. Stat. Ann. §23–212(H) (emphasis added). The
two statements sound as if they mean that a Federal
Government determination that the worker is *unlawful*
is conclusive against the employer, but its determination
that the worker's employment is *lawful* is subject to rebut-
tal by the State. Arizona tells us that the statute means
the opposite. See *ante*, at 16, n. 7. But the legal briefs of
Arizona's attorney general do not bind the state courts.
And until the matter is cleared up, employers, despite I–9
checks, despite efforts to use E-Verify, will hesitate to hire
those they fear will turn out to lack the right to work in
the United States.

And that is my basic point. Either directly or through
the uncertainty that it creates, the Arizona statute will
impose additional burdens upon lawful employers and
consequently lead those employers to erect ever stronger
safeguards against the hiring of unauthorized aliens—
without counterbalancing protection against unlawful
discrimination. And by defining "licensing" so broadly, by
bringing nearly all businesses within its scope, Arizona's
statute creates these effects statewide.

Why would Congress, after deliberately limiting ordi-
nary penalties to the range of a few thousand dollars per
illegal worker, want to permit far more drastic state pen-
alties that would directly and mandatorily destroy entire
businesses? Why would Congress, after carefully balanc-
ing sanctions to avoid encouraging discrimination, want to
allow States to destroy that balance? Why would Con-
gress, after creating detailed procedural protections for
employers, want to allow States to undermine them? Why

would Congress want to write into an express pre-emption provision—a provision designed to prevent States from undercutting federal statutory objectives—an exception that could so easily destabilize its efforts? The answer to these questions is that Congress would not have wanted to do any of these things. And that fact indicates that the majority's reading of the licensing exception—a reading that would allow what Congress sought to forbid—is wrong.

## II

The federal licensing exception cannot apply to a state statute that, like Arizona's statute, seeks to bring virtually all articles of incorporation and partnership certificates within its scope. I would find the scope of the exception to federal pre-emption to be far more limited. Context, purpose, and history make clear that the "licensing and similar laws" at issue involve *employment-related* licensing systems.

The issuance of articles of incorporation and partnership certificates and the like have long had little or nothing to do with hiring or "employment." Indeed, Arizona provides no evidence that any State, at the time the federal Act was enacted, had refused to grant or had revoked, say, partnership certificates, in light of the partners' hiring practices of any kind, much less the hiring of unauthorized aliens. See Ariz. Rev. Stat. Ann. §29–308 (limited partnership formed upon the filing of a certificate of partnership providing names and addresses); §29–345 (providing for dissolution of a limited partnership "[o]n application by or for a partner or assignee . . . whenever it is not reasonably practicable to carry on the business in conformity with the partnership agreement").

To read the exception as covering laws governing corporate charters and partnership certificates (which are not usually called "licensing" laws) is to permit States to turn

virtually every permission-related state law into an employment-related "licensing" law.  The State need only call the permission a "license" and revoke the license should its holder hire an unauthorized alien.  If what was not previously an employment-related licensing law can become one simply by using it as a sanction for hiring unauthorized aliens or simply by state definition, indeed, if the State can call a corporate charter an employment-related licensing law, then why not an auto licensing law (amended to revoke the driver's licenses of those who hire unauthorized aliens)?  Why not a dog licensing law?  Or why not "impute" a newly required license to conduct any business to every human being in the State, withdrawing that license should that individual hire an unauthorized alien?  See S. C. Code Ann. §41–8–20 (Supp. 2010) (providing that "[a]ll private employers in South Carolina . . . shall be imputed a South Carolina employment license, which permits a private employer to employ a person in this State," but conditioning the license on the company's not hiring unauthorized aliens).

Such laws might prove more effective in stopping the hiring of unauthorized aliens.  But they are unlikely to do so consistent with Congress' other critically important goals, in particular, Congress' efforts to protect from discrimination legal workers who look or sound foreign.  That is why we should read the federal exemption's "licensing" laws as limited to those that involve the kind of licensing that, in the absence of this general state statute, would nonetheless have some significant relation to employment or hiring practices.  Otherwise we read the federal "licensing" exception as authorizing a State to undermine, if not to swallow up, the federal pre-emption rule.

### III

I would therefore read the words "licensing and similar laws" as covering state licensing systems applicable pri-

marily to the licensing of firms in the business of recruit-
ing or referring workers for employment, such as the state
agricultural labor contractor licensing schemes in exis-
tence when the federal Act was created. This reading is
consistent with the provision's history and language, and
it minimizes the risk of harm of the kind just described.

The Act's history supports this interpretation. Ever
since 1964, the Federal Government has administered
statutes that create a federal licensing scheme for agricul-
tural labor contractors, firms that specialize in recruiting
agricultural workers and referring them to farmers for a
fee. Farm Labor Contractor Registration Act of 1963
(FLCRA), 78 Stat. 920; Migrant and Seasonal Agricultural
Worker Protection Act (AWPA), 96 Stat. 2583. The stat-
utes require agricultural labor contractors to register with
the federal Secretary of Labor, to obtain a registration
certificate (in effect a license), and to require the contrac-
tor's employees to carry that certificate with them when
engaging in agricultural labor contracting activities.
AWPA §101; FLCRA §4. The statutes list a host of forbid-
den activities, one of which (prior to 1986) was hiring
unauthorized aliens. See AWPA §§103, 106; FLCRA §5(b).
Prior to 1986, if the federal Labor Department believed
a firm had violated these substantive provisions, it could
institute administrative proceedings within the Labor
Department. And if the Secretary found the labor con-
tracting firm had violated the provisions, the Secretary
could impose monetary penalties or withdraw the firm's
registration. AWPA §§103, 503; FLCRA §§5(b), 9.

Most important, and unlike the 1986 Act before us, the
earlier agricultural labor contracting statutes *did not pre-
empt similar state laws.* To the contrary, the earlier Acts
were "intended to supplement State law" and did not
"excuse any person from compliance with appropriate
State law and regulation." AWPA §521; see FLCRA §12.
By 1986, nearly a dozen States had developed state licens-

ing systems for agricultural labor contractors, *i.e.*, firms that recruited and referred farm (and sometimes forestry) workers for a fee; some of these laws provided that state licenses could be revoked if the contractors hired unauthorized aliens. See, *e.g.,* Cal. Lab. Code §1690(f) (Deering Supp. 1991); 43 Pa. Cons. Stat. §§1301.503(4), 1301.505(3) (1965–1983 Supp. Pamphlet); Ore. Rev. Stat. §§658.405(1), 658.440(2)(d) (1987) (covering forestry workers).

In 1986, Congress (when enacting the Act now before us) focused directly upon the earlier federal agricultural labor contractor licensing system. And it changed that earlier system by including a series of conforming amendments in the Act. One amendment removes from the earlier statutes the specific prohibition against hiring unauthorized aliens. It thereby makes agricultural labor contractors subject to the Act's similar general prohibition against such hiring. IRCA §101(b)(1)(C) (repealing AWPA §106). Another amendment takes from the Secretary of Labor most of the Secretary's enforcement powers in respect to the hiring of unauthorized aliens. It thereby leaves agricultural labor contractors subject to the same single unified enforcement system that the immigration Act applies to all employers. See 29 U. S. C. §1853. A third amendment, however, leaves with the Secretary of Labor the power to withdraw the federal registration certificate from an agricultural labor contractor that hired unauthorized aliens. IRCA §101(b)(1)(B)(iii), 29 U. S. C. §1813(a)(6). Thus, the Act leaves this subset of employers (*i.e.*, agricultural labor contractors but not other employers) subject to a federal licensing scheme.

So far, the conforming amendments make sense. But have they not omitted an important matter? Prior to 1986, States as well as the Federal Government could license agricultural labor contractors. Should the 1986 statute not say whether Congress intended that dual system to continue? The answer is that the 1986 Act does

not omit this matter. It answers the coexistence question directly with the parenthetical phrase we are now considering, namely, the phrase, "other than through licensing and similar laws," placed in the middle of the Act's pre-emption provision. 8 U. S. C. §1324a(h)(2). That phrase refers to agricultural labor contractors, and it says that, in respect to those licensing schemes, dual state/federal licensing can continue.

As of 1986, there were strong reasons for permitting that dual system to continue *in this specialized area*. Dual enforcement had proved helpful in preventing particularly serious employment abuses. See, *e.g.*, 128 Cong. Rec. 24090 (1982) (reflecting concerns that agricultural workers were "housed in hovels; . . . subjected to physical abuse and kept in virtual slavery"). And because the contractors' business consists of providing labor forces, their hiring of authorized workers is closely related to their general fitness to do business. See S. Rep. No. 202, 88th Cong., 1st Sess., 1 (1963) (explaining that farm labor contractor registration laws are needed to prevent "irresponsible crew leaders" from "exploit[ing] . . . farmers"); Martin, Good Intentions Gone Awry: IRCA and U. S. Agriculture, 534 Annals Am. Acad. Pol. & Soc. Sci. 44, 49 (1994) (describing how farmers who relied on contractors risked losing their labor forces to immigration raids). Dual enforcement would not create a federal/state penalty disparity, for federal systems as well as state systems provide for license revocation. Experience had shown that dual enforcement had not created any serious conflict or other difficulty. And in light of the specialized nature and comparatively small set of businesses subject to dual enforcement, to permit licensing of that set of businesses would not seriously undermine the objectives of the Act or its pre-emption provision.

Thus, it is not surprising that the legislative history of the 1986 Act's pre-emption provision says that the licens-

ing exception is about the licensing of agricultural labor
contractors. The House Report on the Act, referring to the
licensing exception, states that the Committee did "not
intend to preempt licensing or 'fitness to do business laws,'
*such as state farm labor contractor laws or forestry laws,
which specifically require such licensee or contractor to
refrain from hiring, recruiting or referring undocumented
aliens*." H. R. Rep. No. 99–682, at 58 (emphasis added).

The Act's language, while not requiring this interpreta-
tion, is nonetheless consistent with limiting the scope of
the phrase in this way. Context can limit the application
of the term "licensing" to particular *types* of licensing. The
Act's subject matter itself limits the term to employment-
related licensing. And the Act's specific reference to those
who "recruit or refer for a fee for employment, unauthor-
ized aliens," is consistent with employment-related li-
censing that focuses primarily upon labor contracting
businesses.

Thus, reading the phrase as limited in scope to laws
licensing businesses that recruit or refer workers for
employment is consistent with the statute's language,
with the relevant history, and with other statutory provi-
sions in the Act. That reading prevents state law from
undermining the Act and from turning the pre-emption
clause on its head. That is why I consider it the better
reading of the statute.

IV

Another section of the Arizona statute requires "every
employer, after hiring an employee," to "verify the em-
ployment eligibility of the employee" through the Federal
Government's E-Verify program. Ariz. Rev. Stat. Ann.
§23–214. This state provision makes participation in the
federal E-Verify system *mandatory* for virtually all Ari-
zona employers. The federal law governing the E-Verify
program, however, creates a program that is *voluntary*.

By making mandatory that which federal law seeks to make voluntary, the state provision stands as a significant "'obstacle to the accomplishment and execution of the full purposes and objectives of Congress,'" *Crosby*, 530 U. S., at 373 (quoting *Hines*, 312 U. S., at 67). And it is consequently pre-empted.

The federal statute itself makes clear that participation in the E-Verify program is voluntary. The statute's relevant section bears the title "Voluntary Election to Participate in a Pilot Program." IIRIRA §402, note following 8 U. S. C. §1324a, p. 331. A subsection bears the further title, "Voluntary Election." §402(a). And within that subsection, the statute says that employers "*may* elect to participate." (Emphasis added.) The statute elsewhere requires the Secretary of Homeland Security to "widely publicize . . . the voluntary nature" of the program. §402(d)(2); see also §402(d)(3)(A) (requiring the designation of local officials to advertise the "voluntary nature" of the program). It adds that employers may "terminate" their "election" to participate by following certain procedures. §402(c)(3). And it tells the Secretary of Homeland Security (as an earlier version told the Attorney General) that she "may not require any person or other entity to participate." §402(a); see also §402(e) (creating exceptions, none of which is applicable here, that require federal employers and certain others to participate in E-Verify or another pilot program).

Congress had strong reasons for insisting on the voluntary nature of the program. E-Verify was conceived as, and remains, a pilot program. Its database consists of tens of millions of Social Security and immigration records kept by the Federal Government. These records are prone to error. See, *e.g.,* Office of the Inspector General, Social Security Administration, Congressional Response Report: Accuracy of the Social Security Administration's Numident File 12 (2006) (hereinafter Social Security Report)

(estimating that 3.3 million naturalized citizens are mis-
classified in a Social Security database used by E-Verify);
GAO, Employment Verification: Federal Agencies Have
Taken Steps to Improve E-Verify, but Significant Chal-
lenges Remain 16 (GAO–11–146, 2010) (hereinafter GAO
Report) (noting that "erroneous [nonconfirmations] related
to name inconsistencies . . . remain an issue" that "can
create the appearance of discrimination because of their
disparate impact on certain cultural groups"). And mak-
ing the program mandatory would have been hugely ex-
pensive. See *post*, at 16 (SOTOMAYOR, J., dissenting).

The E-Verify program is still a pilot program, as a mat-
ter of statute and practice. See IIRIRA §401; Letter from
H. Couch to R. Stana (Dec. 8, 2010) (discussing aspects of
E-Verify that have yet to be implemented). The effects of
the program's efforts to take account of, and correct for,
potential errors remain uncertain. Congress could decide
that, based on the results of the pilot, E-Verify should
become a mandatory program. But it has not yet made
that determination. And in making that decision, it will
have to face a number of questions: Will workers receiving
tentative negative verdicts understand the possibility of
administrative challenge? Will they make the effort to
invoke that process, say traveling from a farm to an urban
Social Security office? Will employers prove willing to
undergo the financial burden of supporting a worker who
might lose the challenge? Will employers hesitate to train
those workers during the time they bring their challenges?
Will employers simply hesitate to hire workers who might
receive an initial negative verdict—more likely those who
look or sound foreign? Or will they find ways to dismiss
those workers? These and other unanswered questions
convinced Congress to make E-Verify a pilot program, to
commission continuous study and evaluation, and to insist
that participation be voluntary.

In co-opting a federal program and changing the key

terms under which Congress created that program, Arizona's mandatory state law simply ignores both the federal language and the reasoning it reflects, thereby posing an "'obstacle to the accomplishment'" of the objectives Congress' statute evinces. *Crosby, supra*, at 373 (quoting *Hines, supra*, at 67).

The majority reaches a contrary conclusion by pointing out (1) that Congress has renewed the E-Verify program several times, each time expanding its coverage, to the point where it now encompasses all 50 States; (2) that the E-Verify database has become more accurate; (3) that the Executive Branch has itself mandated participation for federal contractors; and (4) that the statute's language tells the Secretary of Homeland Security, *not the States,* to maintain the program as voluntary.

The short, and, I believe, conclusive answers to these objections are: (1) Congress has kept the language of the statute—and the voluntary nature of the program—the same throughout its program renewals. See 115 Stat. 2407; 117 Stat. 1944; §547, 123 Stat. 2177. And it is up to Congress, not to Arizona or this Court, to decide when participation in the program should cease to be voluntary.

(2) The studies and reports have repeatedly found both (a) that the E-Verify program had achieved greater accuracy, but (b) that problems remain. See, *e.g.,* Social Security Report 11 (estimating that Social Security records contain 4.8 million "discrepancies that could require the numberholder to visit [the Social Security Administration] . . . before employment eligibility would be confirmed"); GAO Report 19 (estimating that, if E-Verify were made mandatory nationwide, 164,000 newly hired workers each year would erroneously be adjudged ineligible to work because of name mismatches, as when the worker's "first or last name is incorrectly spelled in government databases or on identification documents"). And it is up to Congress, not to Arizona or this Court, to determine when

the federally designed and federally run E-Verify program is ready for expansion.

(3) Federal contractors are a special group of employers, subject to many special requirements, who enter voluntarily into a special relation with the Government. For the Federal Government to mandate that a special group participate in the E-Verify program tells us little or nothing about the effects of a State's mandating that nearly every employer within the State participate—as Arizona has done. And insofar as we have not determined whether the Executive was authorized by Congress to mandate E-Verify for federal contractors, it says nothing about Congress' intent.

(4) There is no reason to imply negatively from language telling the Secretary *not* to make the program mandatory, permission for the States to do so. There is no presumption that a State may modify the operation of a uniquely federal program like E-Verify. Cf. *Buckman Co.* v. *Plaintiffs' Legal Comm.*, 531 U. S. 341, 347–348 (2001); *Boyle* v. *United Technologies Corp.*, 487 U. S. 500, 504–505 (1988); see also *post*, at 15–16 (SOTOMAYOR, J., dissenting). The remaining federal statutory language makes clear the voluntary nature of the E-Verify program. Arizona's plan would undermine that federal objective.

For these reasons I would hold that the federal Act, including its E-Verify provisions, pre-empts Arizona's state law. With respect, I dissent from the majority's contrary holdings.

# SUPREME COURT OF THE UNITED STATES

No. 09–115

CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, ET AL., PETITIONERS *v.* MICHAEL B. WHITING ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[May 26, 2011]

JUSTICE SOTOMAYOR, dissenting.

In enacting the Immigration Reform and Control Act of 1986 (IRCA), 100 Stat. 3359, Congress created a "comprehensive scheme prohibiting the employment of illegal aliens in the United States." *Hoffman Plastic Compounds, Inc.* v. *NLRB*, 535 U. S. 137, 147 (2002). The Court reads IRCA's saving clause—which preserves from pre-emption state "licensing and similar laws," 8 U. S. C. §1324a(h)(2)—to permit States to determine for themselves whether someone has employed an unauthorized alien so long as they do so in conjunction with licensing sanctions. This reading of the saving clause cannot be reconciled with the rest of IRCA's comprehensive scheme. Having constructed a federal mechanism for determining whether someone has knowingly employed an unauthorized alien, and having withheld from the States the information necessary to make that determination, Congress could not plausibly have intended for the saving clause to operate in the way the majority reads it to do. When viewed in context, the saving clause can only be understood to preserve States' authority to impose licensing sanctions after a final federal determination that a person has violated IRCA by knowingly employing an unauthorized alien. Because the Legal Arizona Workers Act in-

stead creates a separate state mechanism for Arizona state courts to determine whether a person has employed an unauthorized alien, I would hold that it falls outside the saving clause and is pre-empted.

I would also hold that federal law pre-empts the provision of the Arizona Act making mandatory the use of E-Verify, the federal electronic verification system. By requiring Arizona employers to use E-Verify, Arizona has effectively made a decision for Congress regarding use of a federal resource, in contravention of the significant policy objectives motivating Congress' decision to make participation in the E-Verify program voluntary.

## I

## A

I begin with the plain text of IRCA's pre-emption clause. IRCA expressly pre-empts States from "imposing civil or criminal sanctions (other than through licensing and similar laws) upon those who employ, or recruit or refer for a fee for employment, unauthorized aliens."[1] *Ibid.* The Arizona Act, all agree, imposes civil sanctions upon those who employ unauthorized aliens. The Act thus escapes express pre-emption only if it falls within IRCA's parenthetical saving clause for "licensing and similar laws." *Ibid.*

The saving clause is hardly a paragon of textual clarity. IRCA does not define "licensing," nor does it use the word "licensing" in any other provision. Laws that impose sanctions by means of licensing exist in many forms. Some permit authorities to take action with respect to licenses upon finding that a licensee has engaged in pro-

---

[1] IRCA defines the term "unauthorized alien" to mean, "with respect to the employment of an alien at a particular time, that the alien is not at that time either (A) an alien lawfully admitted for permanent residence, or (B) authorized to be so employed by this chapter or by the Attorney General." 8 U. S. C. §1324a(h)(3).

hibited conduct. See, *e.g.*, Ariz. Rev. Stat. Ann. §4–210(A)(1) (West 2011) (liquor licenses may be suspended or revoked if the licensing authority determines after notice and a hearing that repeated acts of violence have occurred on the licensed premises). Others, more narrowly, permit authorities to take such action following a pre-existing determination by another authorized body that the licensee has violated another provision of law. See, *e.g.*, §4–202(D) (liquor licenses may not be renewed to persons who have been convicted of felonies within the past five years). That both types of laws might be defined in some contexts as licensing laws does not necessarily mean that Congress intended the saving clause to encompass both types. See *Dolan* v. *Postal Service*, 546 U. S. 481, 486 (2006) ("A word in a statute may or may not extend to the outer limits of its definitional possibilities"); see also *FCC* v. *AT&T Inc.*, 562 U. S. ___, ___ (2011) (slip op., at 9) ("[C]onstruing statutory language is not merely an exercise in ascertaining the outer limits of [a word's] definitional possibilities" (internal quotation marks omitted; second alteration in original)). In isolation, the text of IRCA's saving clause provides no hint as to which type or types of licensing laws Congress had in mind.

## B

Because the plain text of the saving clause does not resolve the question, it is necessary to look to the text of IRCA as a whole to illuminate Congress' intent. See *Dolan*, 546 U. S., at 486 ("Interpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose and context of the statute"); *Ali* v. *Federal Bureau of Prisons*, 552 U. S. 214, 222 (2008) (construction of a statutory term "must, to the extent possible, ensure that the statutory scheme is coherent and consistent"); *Davis* v. *Michigan Dept. of Treasury*, 489 U. S. 803, 809 (1989) ("[St]tatutory language cannot be construed in

a vacuum. It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme").[2]

Before Congress enacted IRCA in 1986, a number of States had enacted legislation prohibiting employment of unauthorized aliens. See *ante*, at 2, and n. 1 (citing 12 such laws). California, for example, prohibited the knowing employment of an alien "who is not entitled to lawful residence in the United States" when "such employment would have an adverse effect on lawful resident workers," and made violations punishable by fines of $200 to $500. 1971 Cal. Stats. ch. 1442, §1; see also *De Canas* v. *Bica*, 424 U. S. 351, 352, n. 1 (1976). Kansas went even further, making it a misdemeanor, punishable by a term of confinement not to exceed one month, to employ a person within Kansas knowing "such person to be illegally within the territory of the United States." Kan. Stat. Ann. §§21–4409, 21–4502 (1981).[3]

Congress enacted IRCA amidst this patchwork of state laws. IRCA "'forcefully' made combating the employment of illegal aliens central to 'the policy of immigration law.'" *Hoffman*, 535 U. S., at 147 (quoting *INS* v. *National Center for Immigrants' Rights, Inc.*, 502 U. S. 183, 194, and n. 8 (1991); brackets omitted); see also H. R. Rep. No. 99–682, pt. 1, p. 46 (1986) (hereinafter H. R. Rep. No. 99–682)

—————

[2] As these cases demonstrate, a contextual analysis of a statutory provision is in no way "untethered" from the statute's text. *Ante*, at 15, n. 6. To the contrary, the majority's reading of the saving clause—with its singular focus on the undefined word "licensing" to the exclusion of all contextual considerations—is "untethered" from the statute as a whole.

[3] None of the pre-IRCA state laws cited by the majority provided for licensing-related sanctions. The parties have not identified any pre-IRCA state laws related to licensing that purported to regulate the employment of unauthorized aliens other than those governing agricultural labor contractors. See *ante*, at 13–14 (BREYER, J., dissenting).

("[L]egislation containing employer sanctions is the most humane, credible and effective way to respond to the large-scale influx of undocumented aliens"). As the majority explains, IRCA makes it "unlawful for a person or other entity to hire, or to recruit or refer for a fee, for employment in the United States an alien knowing the alien is an unauthorized alien." §1324a(a)(1)(A); *ante*, at 3. IRCA also requires employers to verify that they have reviewed documents establishing an employee's eligibility for employment. See §1324a(b); *ante*, at 3–4. These two provisions are the foundation of IRCA's "comprehensive scheme prohibiting the employment of illegal aliens in the United States." *Hoffman*, 535 U. S., at 147.

Congress made explicit its intent that IRCA be enforced uniformly. IRCA declares that "[i]t is the sense of the Congress that . . . the immigration laws of the United States should be enforced vigorously *and uniformly*." §115, 100 Stat. 3384 (emphasis added). Congress structured IRCA's provisions in a number of ways to accomplish this goal of uniform enforcement.

First, and most obviously, Congress expressly displaced the myriad state laws that imposed civil and criminal sanctions on employers who hired unauthorized aliens. See §1324a(h)(2); see also H. R. Rep. No. 99–682, at 58 ("The penalties contained in this legislation are intended to specifically preempt any state or local laws providing civil fines and/or criminal sanctions on the hiring, recruitment or referral of undocumented aliens"). Congress could not have made its intent to pre-empt state and local laws imposing civil or criminal sanctions any more "'clear [or] manifest.'" *Medtronic, Inc.* v. *Lohr*, 518 U. S. 470, 485 (1996) (quoting *Rice* v. *Santa Fe Elevator Corp.*, 331 U. S. 218, 230 (1947)).

Second, Congress centralized in the Federal Government enforcement of IRCA's prohibition on the knowing employment of unauthorized aliens. IRCA instructs the

Attorney General to designate a specialized federal agency unit whose "primary duty" will be to prosecute violations of IRCA. §1324a(e)(1)(D). IRCA also instructs the Attorney General to establish procedures for receiving complaints, investigating complaints having "a substantial probability of validity," and investigating other violations. §1324a(e)(1); see also 8 CFR §274a.9 (2010). Upon concluding that a person has violated IRCA, the Attorney General must provide the person with notice and an opportunity for a hearing before a federal administrative law judge (ALJ). 8 U. S. C. §§1324a(e)(3)(A), (B). If the person does not request a hearing, the Attorney General may impose a final, nonappealable order requiring payment of sanctions. §1324a(e)(3)(B). If the person requests a hearing, the ALJ is required to hold a hearing and, upon finding that the person has violated IRCA, must order the payment of sanctions. §1324a(e)(3)(C). The ALJ's order is the final agency order, unless the affected person requests and obtains further administrative appellate review. §1324a(e)(7); see also 28 CFR §68.54 (2010). IRCA grants immigration officers and ALJs "reasonable access to examine evidence of any person or entity being investigated" and provides them with extensive subpoena powers. §1324a(e)(2). And the immigration officers investigating suspected violations obviously have access to the relevant federal information concerning the work authorization status of the employee in question.[4]

Third, Congress provided persons "adversely affected" by an agency order with a right of review in the federal courts of appeals. §1324a(e)(8); see also §1324a(e)(9) (directing the Attorney General in cases of noncompliance to file suit in federal district court to enforce a final order

—————

[4] By regulation, the Attorney General has conferred on parties charged with violating IRCA the right to obtain discovery from the Federal Government in a hearing before an ALJ. See 28 CFR §68.18.

imposing sanctions); §1324a(f) (authorizing the Attorney General to pursue injunctive relief and criminal sanctions in federal district court). In this way, Congress ensured that administrative orders finding violations of IRCA would be reviewed by federal judges with experience adjudicating immigration-related matters.

Fourth, Congress created a uniquely federal system by which employers must verify the work authorization status of new hires. Under this system, an employer must attest under penalty of perjury on a form designated by the Attorney General (the I–9 form) that it has examined enumerated identification documents to verify that a new hire is not an unauthorized alien. §1324a(b)(1)(A); see also 8 CFR §274a.2; *ante*, at 3–4. Good-faith compliance with this verification requirement entitles an employer to an affirmative defense if charged with violating IRCA. §1324a(a)(3); see also H. R. Rep. No. 99–682, at 57. Notably, however, IRCA prohibits use of the I–9 form for any purpose other than enforcement of IRCA and various provisions of federal criminal law. §1324a(b)(5); 8 CFR §274a.2(b)(4). Use of the I–9 form is thus limited to *federal* proceedings, as the majority acknowledges. See *ante*, at 18, n. 9.

Finally, Congress created no mechanism for States to access information regarding an alien's work authorization status for purposes of enforcing state prohibitions on the employment of unauthorized aliens. The relevant sections of IRCA make no provision for the sharing of work authorization information between federal and state authorities even though access to that information would be critical to a State's ability to determine whether an employer has employed an unauthorized alien. In stark contrast, a separate provision in the same title of IRCA creates a verification system by which States can ascertain the immigration status of aliens applying for benefits under programs such as Medicaid and the food stamp

program.    See IRCA §121(a)(1)(C), 42 U. S. C. §1320b–
7(d)(3).    The existence of a verification system in one
provision of IRCA, coupled with its absence in the provi-
sion governing employment of unauthorized aliens, sug-
gests strongly that Congress did not contemplate any role
for the States in adjudicating questions regarding em-
ployment of unauthorized aliens.    Cf. *Bates* v. *United
States*, 522 U. S. 23, 29–30 (1997) ("Where Congress in-
cludes particular language in one section of a statute but
omits it in another section of the same Act, it is generally
presumed that Congress acts intentionally and purposely
in the disparate inclusion or exclusion" (internal quotation
marks and brackets omitted)).

  In an attempt to show that Congress intended for the
Federal Government to share immigration-related in-
formation with the States, Arizona points to a federal
statute, 8 U. S. C. §1373(c), requiring the Government to
respond to certain inquiries from state agencies.    Section
1373(c), however, merely requires the Government to
respond to inquiries from state agencies "seeking to verify
or ascertain the citizenship or immigration status of any
individual within the jurisdiction of the agency."    It does
not require the provision of information regarding an
alien's work authorization status, which is not necessar-
ily synonymous with immigration status.    See 8 CFR
§274a.12(c) (identifying categories of *legal* aliens "who
must apply for employment authorization").[5]    Arizona has
not identified any federal statute or regulation requiring
the Federal Government to provide information regarding
an alien's work authorization status to a State.[6]    More

_____

  [5] For example, spouses and minor children of persons working in the
United States as exchange visitors must apply for employment authori-
zation even though they have lawful immigration status as dependents
of the exchange visitor.    See 8 CFR §274a.12(c)(5).

  [6] In its capacity as an employer, a State may be able to access in-
formation regarding the work authorization status of its employees

importantly, §1373(c) was enacted in 1996, see §642(c), 110 Stat. 3009–707, and thus says nothing about Congress' intent when it enacted IRCA's saving clause a decade earlier. See *Jones* v. *United States*, 526 U. S. 227, 238 (1999).

Collectively, these provisions demonstrate Congress' intent to build a centralized, exclusively federal scheme for determining whether a person has "employ[ed], or recruit[ed] or refer[red] for a fee for employment, unauthorized aliens." 8 U. S. C. §1324a(h)(2).

## C

IRCA's saving clause must be construed against this backdrop. Focusing primarily on the text of the saving clause, Arizona and the majority read the clause to permit States to determine themselves whether a person has employed an unauthorized alien, so long as they do so in connection with licensing sanctions. See *ante*, at 12–13. This interpretation overlooks the broader statutory context and renders the statutory scheme "[in]coherent and [in]consistent." *Ali*, 552 U. S., at 222.

Under the majority's reading of the saving clause, state prosecutors decide whether to commence licensing-related proceedings against a person suspected of employing an unauthorized alien. The majority's holding also permits state courts and other tribunals to adjudicate the question whether an employer has employed an unauthorized alien. The Arizona Act illustrates the problems with reading the saving clause to permit such state action. The Act directs prosecutors to verify an employee's work authorization with the Federal Government pursuant to §1373(c), *e.g.*, Ariz. Rev. Stat. Ann. §23–212(B) (West Supp. 2010), and the state court "shall consider only the federal government's determination pursuant to [§]1373(c)" in "determin-

_____

through use of E-Verify.

ing whether an employee is an unauthorized alien," *e.g.*,
§23–212(H).[7]  Putting aside the question whether §1373(c)
actually provides access to work authorization informa-
tion, §1373(c) did not exist when IRCA was enacted in
1986.  See *supra*, at 9.  Arizona has not identified any
avenue by which States could have accessed work authori-
zation information in the first decade of IRCA's existence.
The absence of any such avenue at the time of IRCA's
enactment speaks volumes as to how Congress would have
understood the saving clause to operate: If States had no
access to information regarding the work authorization
status of aliens, how could state courts have accurately
adjudicated the question whether an employer had em-
ployed an unauthorized alien?

The Arizona Act's reliance on §1373(c) highlights the
anomalies inherent in state schemes that purport to adju-
dicate whether an employee is an authorized alien.  Even
when Arizona prosecutors obtain information regarding
an alien's *immigration* status pursuant to §1373(c), the
prosecutors and state court will have to determine the
significance of that information to an alien's *work authori-
zation* status, which will often require deciding techni-
cal questions of immigration law.   See, *e.g.*, 8 CFR
§§274a.12(a)–(c) (dividing 62 different classes of aliens
into those authorized for employment incident to immigra-
tion status, those authorized for employment with a spe-
cific employer incident to immigration status, and those
who must apply for work authorization).   And, as dis-
cussed above, that information may not shed light at all on
an alien's work authorization status, which is oftentimes
distinct from immigration status.  See *supra*, at 8, and
n. 5.  As a result, in many cases state decisions—made by

_____

[7] However, the "federal government's determination creates [only] a
rebuttable presumption of the employee's lawful status."  *E.g.*, §23–
212(H).

prosecutors and courts with no or little experience in federal immigration law—will rest on less-than-complete or inaccurate information, "creat[ing] enforcement risks not present in the federal system." *Ante*, at 7 (BREYER, J., dissenting). I can discern no reason why Congress would have intended for state courts inexperienced in immigration matters to adjudicate, in the context of licensing sanctions, the very same question that IRCA commits to federal officers, ALJs, and the courts of appeals.

Equally problematic is the fact that employers charged under a state enforcement scheme with hiring unauthorized aliens are foreclosed from using I–9 forms in their defense in the state proceedings. Like IRCA, the Arizona Act confers an affirmative defense on employers who comply in good faith with IRCA's verification requirement. See Ariz. Rev. Stat. Ann. §§23–212(J), 23–212.01(J). As discussed above, however, IRCA prohibits an employer from using the I–9 form to establish that affirmative defense under Arizona law. See 8 U. S. C. §1324a(b)(5); 8 CFR §274a.2(b)(4). Not to worry, the majority says: The employer can establish the affirmative defense through office policies and testimony of employees. *Ante*, at 18, n. 9. But Congress made the I–9 verification system and accompanying good-faith defense central to IRCA. See, *e.g.*, H. R. Rep. No. 99–682, at 60 ("[A]n effective verification procedure, combined with an affirmative defense for those who in good faith follow the procedure, is essential"). Given the importance of this procedure, if Congress in fact intended for state courts to adjudicate whether a person had employed an unauthorized alien in connection with licensing sanctions, why would it have prohibited that person from using the I–9 form—"the employer's most effective evidence," *ante*, at 9 (BREYER, J., dissenting)—in the state-court proceeding? The question answers itself: Congress intended no such thing.

Furthermore, given Congress' express goal of "uni-

for[m]" enforcement of "the immigration laws of the
United States," IRCA §115, 100 Stat. 3384, I cannot be-
lieve that Congress intended for the 50 States and count-
less localities to implement their own distinct enforcement
and adjudication procedures for deciding whether employ-
ers have employed unauthorized aliens.  Reading the sav-
ing clause as the majority does subjects employers to a
patchwork of enforcement schemes similar to the one that
Congress sought to displace when it enacted IRCA.  Hav-
ing carefully constructed a uniform federal scheme for
determining whether a person has employed an unauthor-
ized alien, Congress could not plausibly have meant to
create such a gaping hole in that scheme through the
undefined, parenthetical phrase "licensing and similar
laws."  See *Whitman* v. *American Trucking Assns., Inc.*,
531 U. S. 457, 468 (2001) ("Congress . . . does not, one
might say, hide elephants in mouseholes").

In sum, the statutory scheme as a whole defeats Ari-
zona's and the majority's reading of the saving clause.
Congress would not sensibly have permitted States to
determine for themselves whether a person has employed
an unauthorized alien, while at the same time creating a
specialized federal procedure for making such a determi-
nation, withholding from the States the information nec-
essary to make such a determination, and precluding use
of the I–9 forms in nonfederal proceedings.  See *United
States* v. *Locke*, 529 U. S. 89, 106 (2000) ("We decline to
give broad effect to saving clauses where doing so would
upset the careful regulatory scheme established by federal
law").

To render IRCA's saving clause consistent with the
statutory scheme, I read the saving clause to permit
States to impose licensing sanctions following a final
federal determination that a person has violated
§1324a(a)(1)(A) by knowingly hiring, recruiting, or refer-

ring for a fee an unauthorized alien.[8]  This interpretation both is faithful to the saving clause's text, see *supra*, at 2–3, and best reconciles the saving clause with IRCA's "careful regulatory scheme," *Locke*, 529 U. S., at 106.  It also makes sense as a practical matter.  In enacting IRCA's pre-emption clause, Congress vested in the Federal Government the authority to impose civil and criminal sanctions on persons who employ unauthorized aliens.  Licensing and other types of business-related permissions are typically a matter of state law, however.  See, *e.g.*, *Kamen* v. *Kemper Financial Services, Inc.*, 500 U. S. 90, 98 (1991) (noting that "[c]orporation law" is an area traditionally "governed by state-law standards"); *Chicago Title & Trust*

———

[8]This reading of the saving clause finds support in IRCA's legislative history.  The House Committee on the Judiciary reported that IRCA was "not intended to preempt or prevent lawful state or local processes concerning the suspension, revocation or refusal to reissue a license to any person who has been found to have violated the sanctions provisions *in this legislation*."  H. R. Rep. No. 99–682, at 58 (emphasis added).  The Committee's reference to "this legislation" is, of course, a reference to IRCA, and only federal officers, ALJs, and courts have authority under IRCA to find that a person has violated the statute's sanctions provisions.

My reading is also consistent with, though not compelled by, the provisions in IRCA that amended the Migrant and Seasonal Agricultural Worker Protection Act (AWPA), 96 Stat. 2583.  As JUSTICE BREYER discusses in detail, see *ante*, at 13–15 (dissenting opinion), AWPA requires entities to secure a certificate of registration from the Department of Labor before engaging in any "farm labor contracting activity."  AWPA §101, 96 Stat. 2587, 29 U. S. C. §1811(a).  Before 1986, AWPA prohibited farm labor contractors from hiring unauthorized aliens, and it permitted the Department of Labor to institute administrative proceedings to enforce this prohibition.  See §§103(a)(3), 103(b), 106(a), 96 Stat. 2588–2590.  In IRCA, Congress repealed this prohibition, IRCA §101(b)(1)(C), but authorized the Secretary of Labor to withdraw a contractor's federal registration certificate upon a finding of an IRCA violation, IRCA §101(b)(1)(B)(iii), 100 Stat. 3372, 29 U. S. C. §1813(a)(6).  Thus, IRCA made AWPA's licensing sanctions turn on a prior federal adjudication of a violation of IRCA.

*Co.* v. *Forty-One Thirty-Six Wilcox Bldg. Corp.*, 302 U. S.
120, 127 (1937) ("How long and upon what terms a state-
created corporation may continue to exist is a matter
exclusively of state power").   As a result, if Congress
wanted to "ensur[e] that a full range of sanctions [was]
available to be used against businesses that employ unau-
thorized aliens," Brief for Respondent 37, Congress had to
authorize the States and localities to impose licensing
sanctions following a federal adjudication of a violation of
IRCA.

I do not mean to suggest that the mere existence of a
comprehensive federal scheme necessarily reveals a con-
gressional intent to oust state remedies.   Cf. *English* v.
*General Elec. Co.*, 496 U. S. 72, 87 (1990) ("[T]he mere
existence of a federal regulatory or enforcement scheme
. . . does not by itself imply pre-emption of state reme-
dies"); *New York State Dept. of Social Servs.* v. *Dublino*,
413 U. S. 405, 415 (1973) (rejecting the argument that
"pre-emption is to be inferred merely from the comprehen-
sive character of the federal [program]").   Here, Congress
has made clear its intent to oust state civil and criminal
remedies; the sole question is the scope of the saving
clause's exception for "licensing and similar laws."   The
comprehensive scheme established by Congress necessar-
ily informs the scope of this clause.   For all the reasons
stated, the only interpretation of that clause that is consis-
tent with the rest of the statute is that it preserves the
States' authority to impose licensing sanctions after a final
federal determination that a person has violated IRCA's
prohibition on the knowing employment of unauthorized
aliens.

Under my construction of the saving clause, the Arizona
Act cannot escape pre-emption.   The Act authorizes Ari-
zona county attorneys to commence actions charging an
employer with having employed an unauthorized alien.
Ariz. Rev. Stat. Ann. §§23–212(D), 23–212.01(D).   Arizona

state courts must find that an employer has employed an unauthorized alien before imposing the sanctions enumerated in the Act. §§23–212(F), 23–212.01(F). Because the Act's sanctions are not premised on a final federal determination that an employer has violated IRCA, I would hold that the Act does not fall within IRCA's saving clause and is therefore pre-empted.[9]

## II

I agree with the conclusion reached by JUSTICE BREYER in Part IV of his dissenting opinion that federal law impliedly pre-empts the provision in the Arizona Act requiring all Arizona employers to use the federal E-Verify program. See Ariz. Rev. Stat. Ann. §23–214. I also agree with much of his reasoning. I write separately to offer a few additional observations.

As we have recently recognized, that a state law makes mandatory something that federal law makes voluntary does not mean, in and of itself, that the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Crosby* v. *National Foreign Trade Council*, 530 U. S. 363, 373 (2000) (internal quotation marks omitted). See *Williamson* v. *Mazda Motor of America, Inc.*, 562 U. S. ___, ___ (2011) (slip op., at 1–2) (concluding that a federal regulation permitting manufacturers to choose between two seatbelt options did not pre-empt state tort liability based on a decision to install one of those options); see also *id.*, at ___ (slip op., at 2) (SOTOMAYOR, J., concurring) ("[T]he mere fact that an agency regulation allows manufacturers a choice between options is insufficient to justify implied

——————

[9] Because I believe that the Arizona Act does not fall within IRCA's saving clause for this reason, I have no reason to consider the separate question whether the Act's definition of "license" sweeps too broadly. Compare *ante*, at 9–11, with *ante*, at 1–2, 11–12 (BREYER, J., dissenting).

pre-emption").

This case, however, is readily distinguishable from cases like *Williamson*, in which state law regulates relationships between private parties. Here, the Arizona Act directly regulates the relationship between the Federal Government and private parties by mandating use of a federally created and administered resource. This case thus implicates the "uniquely federal interes[t]" in managing use of a federal resource. *Boyle* v. *United Technologies Corp.*, 487 U. S. 500, 504 (1988) (internal quotation marks omitted); see also *Buckman Co.* v. *Plaintiffs' Legal Comm.*, 531 U. S. 341, 347 (2001) ("[T]he relationship between a federal agency and the entity it regulates is inherently federal in character because the relationship originates from, is governed by, and terminates according to federal law").

Significant policy objectives motivated Congress' decision to make use of E-Verify voluntary. In addition to those discussed by JUSTICE BREYER, see *ante*, at 17–19 (dissenting opinion), I note that Congress considered the cost of a mandatory program. In 2003, when Congress elected to expand E-Verify to all 50 States but declined to require its use, it cited a congressionally mandated report concluding that the annual cost of the pilot program was $6 million, the annual cost of a nationwide voluntary program would be $11 million, and the annual cost of a nationwide mandatory program would be $11.7 *billion*. H. R. Rep. No. 108–304, pt. 1, p. 6 (2003); see also Institute for Survey Research, Temple Univ., and Westat, INS Basic Pilot Evaluation: Summary Report 38 (2002) (concluding that the Social Security Administration (SSA) and the Immigration and Naturalization Service were not "capable of enrolling and administering a program for the hundreds of thousands of employers in any of the large mandatory programs explored here"). A more recent report prepared for the Department of Homeland Security similarly noted the costs associated with mandatory use of

E-Verify. See Westat, Findings of the E-Verify® Program Evaluation 224 (2009) (observing that the SSA estimated that it would have to hire an additional 1,500 field staff to handle a mandatory national program); *id.*, at 251 (recommending that any expansion of E-Verify take place gradually "to allow the Federal government adequate time to hire and train the new staff required to run such a program"). Permitting States to make use of E-Verify mandatory improperly puts States in the position of making decisions for the Federal Government that directly affect expenditure and depletion of federal resources.[10]

The majority highlights the Government's statement in its *amicus* brief that "'the E-Verify system can accommodate the increased use that the Arizona statute and existing similar laws would create.'" *Ante*, at 25 (quoting Brief for United States as *Amicus Curiae* 34). But "[t]he purpose of Congress is the ultimate touchstone in every pre-emption case." *Medtronic*, 518 U. S., at 494 (internal quotation marks omitted). It matters not whether the Executive Branch believes that the Government is now capable of handling the burdens of a mandatory system.[11] Congressional intent controls, and Congress has repeatedly decided to keep the E-Verify program voluntary. Because state laws requiring use of E-Verify frustrate the significant policy objectives underlying this decision,

—————

[10] In *Williamson* v. *Mazda Motor of America, Inc.*, 562 U. S. \_\_\_, \_\_\_ (2011) (slip op., at 10), we held that the Federal Government's judgment regarding the cost effectiveness of seatbelt options did not reveal an intent "to forbid common-law tort suits in which a judge or jury might reach a different conclusion." The obvious distinction between that case and this one is that Congress' decision to keep use of E-Verify voluntary bears directly on the costs to the Federal Government itself.

[11] Notably, the Government's brief does not state that the E-Verify system could accommodate the increased use that would result if all 50 States enacted similar laws; it limits its statement to "the Arizona statute and *existing* similar laws." Brief for United States as *Amicus Curiae* 34 (emphasis added).

thereby imposing explicitly unwanted burdens on the Federal Government, I would hold that federal law impliedly pre-empts the Arizona requirement.

\*     \*     \*

For these reasons, I cannot agree with either of the Court's holdings in this case. I respectfully dissent.